T.C. Memo. 2005-6

UNITED STATES TAX COURT

WINSTON KNAUSS, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12878-01, 7328-02.    Filed January 18, 2005.

F. Pen Cosby, for petitioner.

Ronald T. Jordan and Angela J. Kennedy, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  By notice of deficiency dated August 10, 2001, respondent determined an income tax deficiency and fraud penalty under section 6663(a)[1] with regard to petitioner's 1997 taxable year.  By notice of deficiency dated January 23, 2002, respondent

_____

    [1] Unless otherwise noted, all section references are to the Internal Revenue Code as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

determined income tax deficiencies and fraud penalties under section 6663(a) with respect to petitioner's 1991, 1994, 1995, and 1996 taxable years. Petitioner timely petitioned for redetermination with respect to both notices, and the cases covering each were consolidated for trial, briefing, and opinion. The deficiencies and fraud penalties determined were as follows:

|  |  | Penalty |
| Year | Deficiency | Sec. 6663(a) |
| 1991 | $4,323 | $3,242 |
| 1994 | 88,012 | 66,009 |
| 1995 | 182,387 | 136,790 |
| 1996 | 173,624 | 130,218 |
| 1997 | 185,155 | 139,616 |

After concessions,[2] the issues for decision in these cases ("this case") are: (1) Whether petitioner understated gain on the sale of yachts in 1994, 1996, and 1997 by $155,848, $527,074, and $615,119, respectively; (2) whether petitioner understated gain from the sale of real property in 1995 by $232,400; (3) whether petitioner had unreported income from his yacht charter business in 1994, 1995, and 1996 of $68,350, $190,615, and $34,544, respectively; (4) whether petitioner failed to report income of $92,420, $36,000, and $13,000 in 1994, 1996, and 1997, respectively, from the settlement of lawsuits; (5) whether

---

[2] Petitioner has conceded that he received $85,119 of income in 1995 as a finder's fee that was not reported on his 1995 return. Respondent has conceded that his determination of the amount of unreported gain on the sale of a yacht in 1994 was overstated by $1,000.

petitioner's wholly owned S corporation, Winston Development, Inc., overstated deductions on its 1995 Federal income tax return by $54,802; (6) whether there was an underpayment of tax in 1991; and (7) whether the underpayments of tax in 1991, 1994, 1995, 1996, and 1997 were due to fraud.

## FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated into our findings by this reference.

Petitioner was a resident of Ft. Lauderdale, Florida, when the petitions were filed.

Petitioner's Background

Petitioner is a high school graduate. He initially held a variety of construction jobs before becoming trained to be a construction project estimator.

In 1968, petitioner started a demolition business that he operated successfully for 20 years. His business interests grew to include apartment buildings, a hotel, and a country club. In 1988, petitioner organized Winston Development, Inc. (WDI),[3] an S corporation, to build and sell condominiums in Indiana. At all relevant times, petitioner owned 100 percent of the stock of WDI.

In the mid-1980s, petitioner also became successfully

---

[3] The parties have stipulated that the name of the corporation was "Winston Development, Inc.", though the corporation filed its tax returns as "Winston Development Corp.", and it is frequently referred to in the record by that name.

engaged in the business of chartering yachts for "dinner cruises" in Ft. Lauderdale, Florida.  In the 1990s, petitioner had several yachts built.  Petitioner would typically use the newly constructed yachts in his charter business and eventually sell them.

Petitioner married Pam Maire in 1993, but they separated in February 1995.  They filed for divorce in 1995 but reconciled in June 1996.  The couple separated again in 1997 and ultimately were divorced.

In 1996, petitioner was convicted of three counts of felony forgery for forging the signatures of nearby residents to documents indicating they approved of petitioner's application for a liquor license for his country club.

Asset Sales

Wrecking Krew

In 1991, petitioner entered into a fixed-price contract with Marine Builders, Inc., to deliver a completed yacht, built to his specifications, for $796,707.  On December 20, 1991, the yacht received a certificate of inspection by the U.S. Coast Guard, which is issued only after a vessel is considered ready to carry passengers for hire, and was assigned identification No. D979342.  Petitioner took delivery of the yacht the same day and used it in his charter business.  The vessel was named the Wrecking Krew.  Petitioner paid Marine Builders, Inc., the $796,707 contract

price for the yacht.  Shortly after taking delivery, petitioner paid $2,683 to install deck lights.

In 1992, petitioner advised his return preparer that the purchase price of the yacht was $833,218.

On January 27, 1994, petitioner sold the Wrecking Krew to Dream USA, Inc., for $950,000.[4]  At the time of sale, petitioner incurred the following costs: $13,068 for lead ballast; $1,000 for lead ballast installation; $5,563 in architect's fees; and a sales commission of $51,000.  The sum of the foregoing items, plus the contract price paid to Marine Builders, Inc., and the cost of the deck lights, equaled $870,021.

Petitioner reported on his 1994 return that his basis in the Wrecking Krew (plus selling expenses) was $1,025,869.  Adjusted basis reported on the return, as a result of a claim of $100,740 in depreciation, was $925,129, resulting in a reported gain of $24,871 on the sale of the vessel.  Accepting petitioner's claimed depreciation, respondent nonetheless determined that petitioner's adjusted basis in the vessel at the time of sale had been overstated by $156,848, resulting in a determination of unreported gain in that amount.  In the answer, respondent

---

[4] By the time of the sale, petitioner had renamed the vessel Sir Winston, the same name used for the two other vessels at issue in this case.  For simplicity, we shall refer to this vessel as the Wrecking Krew.

conceded an additional $1,000 in selling expenses for lead ballast installation, resulting in unreported gain of $155,848.

Sir Winston

On December 15, 1992, petitioner entered into a contract with Darling Yachts, Inc., to construct a yacht to his specifications for $623,706. The contract provided for an offset to the contract price for any item supplied by petitioner that Darling Yachts, Inc., was obligated to provide under the contract. Petitioner supplied a $2,395 radar system and $18,433 in carpeting that Darling Yachts, Inc., was obligated to provide. Petitioner also paid $49,220 for architectural fees, galley equipment, blinds and wallpaper, miscellaneous electronics, life jackets, and a security system for the yacht that were not required to be provided by Darling Yachts, Inc.

Darling Yachts, Inc., did not complete the vessel by the December 15, 1993, completion deadline specified on the contract. When it had still not been completed approximately 12 months later, petitioner took possession on December 6, 1994, and undertook the completion work himself. Immediately prior to petitioner's taking possession, a marine survey report[5] on the

---

[5] The parties' stipulation covering this report states that the survey was conducted on Nov. 3, 1994. However, the report itself is a stipulated exhibit and states that the survey was conducted on Dec. 3, 1994. We therefore conclude that the stipulation is erroneous and that the survey date was Dec. 3, 1994.

yacht concluded that it was 95 percent complete, and the vessel was issued a certificate of inspection by the U.S. Coast Guard, subject to the correction of certain minor deficiencies. The vessel was assigned identification No. D1026508 and named the Sir Winston.

Petitioner caused WDI to pay for the installation of mirrors, doorframes, carpeting, and other fixtures on the Sir Winston, and two individuals on the WDI payroll did finishing work on the Sir Winston interiors. Petitioner also replaced a defective steering mechanism that had been installed by Darling Yachts, Inc.[6]

During the 1-year period after petitioner took possession of the Sir Winston (December 6, 1994 to December 6, 1995), petitioner had four checking accounts. During this period, the checks drawn on those accounts that could have been for capital improvements to the Sir Winston did not exceed $195,799. During this period, petitioner also had two credit cards through which he made expenditures totaling $29,917.

In April 1996, petitioner sold the Sir Winston to Dream USA, Inc., for $1,250,000. Petitioner advised his return preparer, and reported on his 1996 return, that his basis in the Sir

_____

[6] The failure of Darling Yachts, Inc., to complete the vessel satisfactorily, or to deliver it on time, prompted litigation between petitioner and Darling Yachts, Inc., discussed infra.

Winston was $1,200,000. Adjusted basis reported on the return, as a result of a claim of $33,360 in depreciation, was $1,166,640, resulting in a reported gain of $83,360 on the sale of the vessel. Accepting petitioner's claimed depreciation, respondent nonetheless determined that petitioner's adjusted basis in the vessel at the time of sale was $639,566, or $527,074 less than claimed by petitioner, resulting in a determination of unreported gain in that amount.

Sir Winston II

On December 5, 1994, petitioner entered into a fixed-price contract with Marine Builders, Inc., to build a yacht to his specifications for $1,099,173. Petitioner made cash payments totaling $39,000 toward the construction of the yacht. Petitioner also made direct payments to vendors totaling $33,330 for improvements to the yacht during its construction. The yacht was issued a certificate of inspection by the U.S. Coast Guard and assigned identification No. D1037815. The yacht was delivered complete and ready to carry passengers for hire on January 11, 1996. Petitioner also named this vessel the Sir Winston (Sir Winston II).

During the 1-year period after petitioner took delivery of the Sir Winston II (January 11, 1996 to January 11, 1997), petitioner had two checking accounts and a brokerage account on which he could draw checks. During this period, the checks drawn

on those accounts that could have been for capital improvements to the Sir Winston did not exceed $79,347. During this period, petitioner also had two credit cards through which he made expenditures totaling $54,589.

Petitioner sold the Sir Winston II to Dream Boat, Inc., for $2 million on April 7, 1997. Petitioner advised his return preparer, and reported on his 1997 return, that his basis in the Sir Winston II was $1,789,322. Adjusted basis reported on the return, as a result of a claim of $41,700 in depreciation, was $1,747,622, resulting in a reported gain of $252,378 on the sale of the vessel. Accepting petitioner's claimed depreciation, respondent nonetheless determined that petitioner's adjusted basis in the vessel at the time of sale was $1,132,503, or $615,119 less than claimed by petitioner, resulting in a determination of unreported gain in that amount.

### Later-Built Yachts

Petitioner had four more yachts constructed by Marine Builders, Inc., in addition to the Wrecking Krew and Sir Winston II at issue in this case. Those later-built yachts were constructed pursuant to "cost-plus" contracts, whereas the Wrecking Krew and Sir Winston II were constructed pursuant to fixed-price contracts. Under the "cost-plus" contracts with Marine Builders, Inc., petitioner supplied a greater portion of

the material used in the vessel's construction than under the previous fixed-price contracts.

### Real Property

On June 7, 1995, petitioner sold real property at 6729 Westfield Boulevard, Indianapolis, Indiana, to Evergreen, LLC for $1,500,000.  Prior to the sale, petitioner leased the property to Winston Yacht and Country Club, Inc., a country club wholly owned by petitioner.  In November 1995, petitioner provided his return preparer with a handwritten schedule that purported to list improvements made to the property between 1990 and 1995 that totaled $232,400.  Petitioner had not previously advised his tax return preparer of these improvements.  The improvements were included in the cost basis of $1,045,742 reported on petitioner's 1995 return.

Respondent determined that petitioner's claimed basis in the property should be reduced by $232,400 for failure to substantiate, resulting in a determination of unreported gain in that amount.

## Business Income

### Yacht Charter Business

Petitioner was engaged in the yacht charter business in 1994, 1995, and 1996.  Petitioner advised his return preparer, and reported on his returns, that gross receipts from his yacht

charter business were $74,893, $215,427, and $320,532 in 1994, 1995, and 1996, respectively.

In the notice of deficiency, respondent determined that petitioner's gross receipts were $144,217, $415,018, and $364,247 in 1994, 1995, and 1996, respectively, resulting in determinations of unreported gross receipts of $68,350, $190,615, and $34,544 in those years.[7] With respect to 1994, petitioner subsequently admitted that he deposited charter receipts of $116,095, an amount exceeding his reported charter gross receipts by $41,202. He further admitted that in 1994 he made additional deposits of funds from third parties totaling $29,247 and cash of $7,000, but denied that these amounts represented charter receipts. With respect to 1995, petitioner subsequently admitted that he deposited charter receipts of $399,239, an amount exceeding his reported charter gross receipts by $182,812. He further admitted that in 1995 he made additional deposits of funds from third parties totaling $5,733, but denied that this amount represented charter receipts. With respect to 1996, petitioner subsequently admitted that he deposited charter receipts of $318,471, an amount that is $2,061 less than his reported charter gross receipts. He further admitted that in 1996 he made additional deposits of funds from third parties

---

[7] In determining unreported gross receipts, respondent made adjustments for petitioner's collection of sales tax.

totaling $2,075 and cash of $35,800, but denied that these amounts represented charter receipts.

WDI

WDI was engaged in the construction and sale of condominium units.  WDI reported gross receipts of $1,342,216 and $1,624,352 in 1995 and 1996, respectively.  Petitioner reviewed all of the checks written from the WDI corporate account and often directed the accounting code to which they should be charged.  In 1995, petitioner directed that invoices for expenses associated with the Sir Winston be paid by checks drawn on WDI's corporate account.  WDI then deducted the yacht expenditures as expenses on its 1995 Federal income tax return.  WDI's bookkeeper questioned petitioner about the payment of invoices for the yacht with checks drawn on the WDI corporate account and was specifically instructed by petitioner to record the checks for the yacht expenses on WDI ledger accounts that he designated.  Some of the checks for the yacht expenses were recorded on WDI's books as "repair and maintenance", while others were recorded as additions to an asset account for a condominium building under construction.  The amounts recorded as repair expenses were deducted on WDI's 1995 return as current expenses.  The asset account charges were included in the "cost of sales" for condominium units sold in 1995, resulting in a deduction in that year.

Settlements of Lawsuits

　　Marine Builders, Inc.

　　In 1993 petitioner filed suit against Marine Builders, Inc., seeking damages for breach of warranty, breach of contract, conversion, lost income, and lost value in connection with the contract to construct the Wrecking Krew. In 1994, petitioner and Marine Builders, Inc., entered into a settlement agreement which provided that three installments (totaling $92,420) would be paid to petitioner "in settlement of damages for contractual claims that Winston Knauss has alleged against Marine Builders, Inc.", and that three further installments (totaling $85,119) would be paid to petitioner "as a separate matter and as such are not alleged damages to Winston Knauss for the contracts referenced in the complaint for damages." The settlement agreement further provided that the initial three installments "are not to be considered income under any respects to Winston Knauss". The agreement was silent regarding any such characterization of the latter three installments. The initial three installments (totaling $92,420) were paid to petitioner in 1994, and the final three installments (totaling $85,119) were paid to him in 1995. Marine Builders, Inc., issued a Form 1099-Misc, Miscellaneous Income, to petitioner for 1995 denoting $85,119 as nonemployee compensation. Petitioner subsequently admitted that the $85,119

was paid to him as a finder's fee for referral of a customer to Marine Builders, Inc.

Petitioner did not inform his return preparer of any of the foregoing payments, and they were not reported as income on his 1994 or 1995 returns.

Darling Yachts, Inc.

On February 23, 1995, petitioner filed suit against Darling Yachts, Inc., seeking damages for breach of warranty, failure to complete the vessel, and lost income in connection with the contract to construct the Sir Winston. An Agreed Judgment in the case was entered on March 18, 1995, which provided that petitioner was entitled to recover $65,000 from Darling Yachts, Inc., in satisfaction of his claims. The judgment further provided that an initial installment of $25,000 was due upon the execution of the judgment by the parties, with further monthly installments of $1,000 commencing January 10, 1996. The judgment was not executed until March 13, 1996. Pursuant thereto, Darling Yachts, Inc., paid petitioner $65,000, of which $36,000 was paid in 1996, and $13,000 was paid in 1997.

Petitioner did not inform his return preparer of the foregoing payments, and they were not reported as income on his 1996 or 1997 returns.

Net Operating Loss Carryback

Petitioner timely filed a Form 1045, Application for Tentative Refund, claiming an adjustment to his 1991 Federal income tax based on a net operating loss from 1994.

Books and Records

Petitioner did not produce books and records in support of his yacht purchases or sales, his yacht charter business, his real estate transactions, or any of his personal financial transactions. When petitioner and his ex-wife, a school teacher, separated in February 1995, she took records related to their joint checking accounts with NBD Bank[8] and SunTrust Bank. In March 1997, following a period of reconciliation but pending their final divorce, petitioner's ex-wife again took joint checking account records.

OPINION

Gain From Sale of Yachts

Respondent determined that petitioner overstated his basis, and therefore had unreported gain, in the amounts of $156,848,[9] $527,074, and $615,119 in 1994, 1996, and 1997, respectively, from the sale of a yacht in each year. In reaching his determination of petitioner's basis, respondent used the sum of

---

[8] Petitioner's ex-wife also refers to an account at Summit Bank, which was acquired by NBD Bank sometime in or around 1993.

[9] As noted, respondent conceded in his answer that the amount of unreported gain was $1,000 less, or $155,848.

the contract price for each yacht's construction and capital improvements that had been substantiated. Petitioner contends that he in fact made expenditures to account for his claimed basis, but is unable to substantiate the expenditures because all of his records were stolen by his estranged spouse. On account of this purported theft, petitioner, relying on Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), urges us to accept a reconstruction of his basis based upon an extrapolation from the costs he incurred in the construction of certain other yachts in later years.[10]

We do not find credible petitioner's claim that his boat records were stolen by his former spouse. The former spouse testified credibly that the only records she took when she left petitioner were those pertaining to the couple's personal joint checking accounts.[11] She denied taking records related to his yachts, yacht charter business, or any other records besides the joint checking accounts in either 1995 or 1997. Petitioner did not issue a subpoena to his former spouse in an effort to obtain

---

[10] Petitioner has neither claimed nor shown entitlement to any shift in the burden of proof pursuant to sec. 7491(a). Accordingly, petitioner retains the burden of proof with respect to all issues in this case except respondent's determinations of fraud for the years in issue. See Rule 142(a) and (b).

[11] The checking account records taken by petitioner's spouse are in the record and, as discussed more fully hereinafter, do not support petitioner's claim that he made expenditures that created basis in the amounts he claims.

the records he claims she took, even though she appeared as a witness in this case. Moreover, some of the purportedly stolen records in fact turned up as part of petitioner's evidence intended to document expenditures for yachts built in later years. That is, although petitioner claimed that the records substantiating claimed capital improvements to the Sir Winston II that he made from January 1996 to January 1997 were stolen, invoices for yacht-related expenditures dated within that period were offered by him into evidence for other purposes.[12]

Our conclusion that petitioner did not make the basis-generating expenditures that he claims is further buttressed by the fact that, although the unaccounted for expenditures range from $155,848 in 1994 to $615,119 in 1997, petitioner did not seek the testimony of, or even identify, a single vendor or service provider associated with a claimed capital improvement to any of the vessels at issue. Instead, he merely rested on his claim that records were stolen and made no effort, through the time of trial, to reconstruct those records through bank records or contacts with third-party vendors.

Even if we accepted petitioner's claim that his records were stolen, his attempt to estimate the expenditures so that we would

---

[12] The same occurred with respect to purportedly stolen records substantiating capital improvements to the Sir Winston. Petitioner offered a yacht-related invoice dated Oct. 24, 1995, notwithstanding his claim that records covering the period including this date had been stolen.

accept them under the Cohan rule is unavailing.  We do not accept

petitioner's estimates under the Cohan rule for two reasons.

First, to qualify for the Cohan rule, a taxpayer must show that

some expenditure in fact occurred and only its precise amount

lacks direct proof.  See Cohan v. Commissioner, supra at 543-544

(Board of Tax Appeals's disallowance of any deduction for

entertainment expenditure inconsistent with its finding that

expenditure was made); see also Portillo v. Commissioner, 932

F.2d 1128, 1134-1135 (5th Cir. 1991)(court has discretion to

estimate allowable deductions if there is sufficient evidence to

support the contention that expenses were in fact incurred),

affg. in part, revg. and remanding in part T.C. Memo. 1990-68;

Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).  Here, we are

not persuaded that the claimed expenditures occurred.  Two of the

yachts at issue were fully completed when delivered to

petitioner.  The remaining vessel, the Sir Winston, was nearly

complete but required finishing work and replacement of the

steering mechanism, expenditures which we are satisfied have been

accounted for.[13]  Thus, we are not persuaded in these

---

[13] Respondent has shown that certain expenditures made by
petitioner with respect to the Sir Winston were caused by him to
be paid and deducted by his S corporation engaged in condominium
development and that petitioner deducted significant amounts for
repairs to the Sir Winston in the year when petitioner took
delivery.  On balance, we are satisfied that the expenditures
required to finish the Sir Winston have been accounted for and do
not provide a basis for invoking the Cohan rule.

circumstances that expenditures in fact occurred which lack only direct proof as to their amounts.

Second, petitioner's attempt to estimate his purported expenditures for capital improvements for the yachts is not reliable. Petitioner has proffered spreadsheets that purport to document the expenditures he incurred to complete certain other yachts that he arranged to have constructed in years after the construction of the vessels at issue. As best we understand petitioner's argument, he contends that the expenditures he made to complete the later-built yachts provide a basis for estimating the capital expenditures he made with respect to the yachts at issue.

However, petitioner's analysis is fundamentally flawed. The later-built yachts were constructed pursuant to "cost-plus" contracts, whereas the yachts at issue were constructed pursuant to fixed-price contracts. The unchallenged testimony of an official at Marine Builders, Inc., was that under the "cost-plus" contracts, petitioner himself provided a greater portion of the material used in the vessel's construction than under fixed-price contracts. Thus, it has not been shown that the expenditures that petitioner may have been required to incur in connection with the completion of a yacht under a "cost-plus" contract approximate the expenditures he would have incurred to obtain a completed yacht under a fixed-price contract. Moreover, even if

petitioner's methodology were reasonable, the invoices that petitioner proffered to substantiate the costs he claims to have incurred in connection with the construction of the later-built yachts were repeatedly shown to have dates that preceded the commencement of construction of the yacht whose costs they purportedly substantiated. Even more egregious were repeated instances where invoices' dates had been crudely altered in an effort to make the invoices appear to have been created within the time period that the yacht whose costs they purported to substantiate was built. In sum, petitioner's effort to invoke the Cohan rule to substantiate his claimed basis in the three yachts is wholly unreliable, and we reject it.

Because petitioner has failed to substantiate any basis in the three yachts beyond that determined by respondent, we sustain respondent's determination that petitioner had unreported gain from the sale of yachts of $155,848, $527,074, and $615,119 in 1994, 1996, and 1997, respectively.

Gain From Sale of Real Property

In 1995, petitioner sold real property at 6729 Westfield Boulevard, Indianapolis, that he leased to the Winston Yacht and Country Club, Inc. Petitioner reported an adjusted basis in the Westfield Boulevard property at the time of sale of $1,045,742, which included capital improvements of $232,400. Respondent

determined that the claimed capital improvements of $232,400 should be disallowed for lack of substantiation.

The only substantiation of the $232,400 that has been offered by petitioner in this proceeding is a handwritten list of capital improvements and their purported cost (totaling $232,400) that he gave his return preparer in November 1995. There are no invoices or other supporting documentation for these claimed expenditures. Instead, petitioner again asserts his contention that his records were stolen and claims entitlement to an estimate under the Cohan rule.

As with the claimed expenditures concerning the yachts, there is no proof that expenditures of this nature were in fact incurred, nor is there any evidence to support a reasonable estimate of the amount of these expenditures. We accordingly sustain respondent's determination that $232,400 of petitioner's claimed basis be disallowed and petitioner's gain on the sale be increased in a corresponding amount.

Understatement of Income From Charter Business

Taxpayers must maintain records sufficient to establish the amount of income required to be shown on a return. Sec. 1.6001-1(a), Income Tax Regs. In the absence of adequate records, the Commissioner may reconstruct the taxpayer's income by any reasonable method. Estate of Rau v. Commissioner, 301 F.2d 51 (9th Cir. 1962), affg. T.C. Memo. 1959-117; Schellenbarg v.

Commissioner, 31 T.C. 1269 (1959), affd. in part and revd. in part on another issue 283 F.2d 871 (6th Cir. 1960); Bolton v. Commissioner, T.C. Memo. 1975-373.

Petitioner failed to produce records establishing his gross receipts from his yacht charter business for 1994, 1995, and 1996. Using third-party records, respondent determined that petitioner's gross receipts were $144,217, $415,018, and $364,247 in 1994, 1995, and 1996, respectively, resulting in a determination of unreported gross receipts of $68,350, $190,615, and $34,544 in those years.

As outlined in our findings, with respect to 1994, petitioner has admitted depositing charter receipts of $116,095[14] and other amounts which bring total deposits to $152,342, as compared to respondent's determination that his gross receipts were $144,217. With respect to 1995, petitioner has admitted depositing charter receipts of $399,239[15] and other amounts which bring total deposits to $404,972, as compared to respondent's determination that his gross receipts were $415,018. With respect to 1996, petitioner has admitted depositing charter receipts of $318,471 and other amounts, which bring total

[14] This figure exceeds petitioner's reported gross receipts for 1994 by $41,202.

[15] This figure exceeds petitioner's reported gross receipts for 1995 by $182,812.

deposits to $356,346, as compared to respondent's determination that his gross receipts were $364,247.

The only specific error in respondent's analysis that petitioner has alleged is his claim that respondent failed to take account of amounts that were subsequently refunded to customers when charters were canceled. As evidence for his claim, petitioner proffers 14 checks he wrote in 1994 and 12 in 1996. The 1994 checks generally contain a notation that they are refunds (with two exceptions), while the 1996 checks generally do not (with two exceptions). There is a fatal defect in most of these checks; namely, there is no evidence that the payee of the refund check was included as a source of income in respondent's reconstruction of petitioner's charter receipts. Respondent's reconstruction is not necessarily comprehensive. Thus, unless a refund payee was listed as one of the sources of a deposit in respondent's reconstruction, proof that a refund was made to that payee does not require a downward adjustment in respondent's reconstructed total.

For 1994, eight of petitioner's proffered checks contain the foregoing defect.[16] Six checks remain, four of which, for $10,314 in the aggregate, have "United Yacht Charters" as the payee. However, the evidence in the record of respondent's

---

[16] While it is possible that some of the 1994 checks listed by petitioner were refunds of amounts deposited in 1993 or earlier years, petitioner has not established this fact.

reconstruction shows that only $7,762 of receipts from "United Yacht Charters" was included therein for 1994. We therefore conclude that the downward adjustment to respondent's figure that is appropriate in light of petitioner's refund evidence is capped at $7,762. The remaining two checks, both evidencing refunds to "K.D.B." aggregating $8,900, should result in a downward adjustment in that amount, as respondent's reconstruction for 1994 includes receipts from "K.D.B." in excess of $8,900. Thus, we conclude that petitioner has shown error in respondent's reconstruction of 1994 gross receipts; they are overstated by $16,662.

For 1996, all but 3 of petitioner's 12 proffered checks suffer the defect of their payee's not having been shown to be a source of a deposit in respondent's reconstruction of petitioner's charter gross receipts; that is, none of the payees on these purported refund checks is listed as the source of a deposit in respondent's reconstruction of 1994, 1995, or 1996 gross receipts, and petitioner has not established that any was a source in some other year. Of the three remaining, we disregard two because the checks (for $1,020 to "Betty Corson Yacht Charter, Inc." and for $2,000 to "Gold Coast") do not on their face indicate that they are refunds, and there is no other evidence to corroborate petitioner's claim to that effect. The remaining check, evidencing a refund of $2,000 to "Al Schrold",

produces only a minor adjustment, because the available evidence indicates that only $75 in income from this source was included in respondent's reconstruction of 1994-96 gross receipts (and petitioner has failed to show inclusion in his income in any other year). We therefore conclude that the downward adjustment in respondent's reconstruction that is appropriate in light of petitioner's evidence is capped at $75. Thus, we conclude that petitioner has shown error in respondent's reconstruction of 1996 gross receipts, in that it is overstated by $75.

Petitioner has not alleged or shown any other error in respondent's reconstruction of the gross receipts from petitioner's yacht charter business in 1994, 1995, or 1996. We accordingly sustain respondent's determination of unreported charter income in those years, except to the extent of $16,662 in 1994 and $75 in 1996.

Disallowed Deductions of WDI

Taxpayers may deduct the ordinary and necessary expenses of carrying on a trade or business. Sec. 162. Expenses incurred by a corporation for the personal benefit of its shareholders are not deductible. Intl. Trading Co. v. Commissioner, 275 F.2d 578, 585 (7th Cir. 1960), affg. T.C. Memo. 1958-104. Further, a taxpayer may not deduct the business expenses of another taxpayer. Welch v. Helvering, 290 U.S. 111, 114 (1933). The burden of proof with respect to deductions claimed rests on the

taxpayer.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943); Deputy v. duPont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

In the notice of deficiency, respondent determined that petitioner had additional income of $54,802 from WDI for 1995, as a result of the disallowance of deductions on the corporation's 1995 return in that amount.  Petitioner has not shown that WDI is entitled to any of the deductions that were disallowed.  We accordingly sustain respondent's determination that WDI's deductions totaling $54,802 for 1995 should be disallowed.

At trial, respondent also proffered detailed evidence demonstrating that petitioner caused WDI to pay $18,660 in expenditures for yachts, and that these expenditures were deducted on WDI's 1995 return.  While petitioner argues on brief that the yacht-related expenditures deducted by WDI were proper because they were reflected in petitioner's drawing account, we need not resolve this issue, as respondent has sought no increase in the 1995 deficiency as a result of this evidence.[17]

---

[17] We surmise that respondent proffered this evidence in support of his determination of fraud.

Unreported Income From Settlements of Lawsuits

Marine Builders, Inc.

Petitioner argues that the $92,420 he received in 1994 in settlement of his lawsuit against Marine Builders, Inc., was a return of capital.[18]  The taxability of proceeds received from a lawsuit depends on the nature of the claim and the basis of the recovery.  Raytheon Prod. Corp. v. Commissioner, 144 F.2d 110, 114 (1st Cir. 1944), affg. 1 T.C. 952 (1943).  When amounts received from a lawsuit, through litigation or settlement, represent lost profits, the amount is taxable income; when the amount represents damages for lost capital, such amount is not taxable.  Booker v. Commissioner, 27 T.C. 932, 937 (1957); Raytheon Prod. Corp. v. Commissioner, 1 T.C. 952, 958 (1943), affd. 144 F.2d 110 (1st Cir. 1944).  Petitioner bears the burden of establishing that the proceeds of a settlement are what he claims them to be.  Milenbach v. Commissioner, 318 F.3d 924 (9th Cir. 2003), affg. on this issue 106 T.C. 184 (1996).

The complaint against Marine Builders, Inc., sought damages for breach of warranty, lost income, and loss of value.  The settlement indicated that payments of $92,420 were for "damages for contractual claims" but did not indicate what portion, if any, of the payments was attributable to lost value versus lost

_____

[18] Petitioner concedes that the remaining $85,119 payment received from Marine Builders, Inc., in 1995 is taxable income.

income.  We have held that where the evidence did not provide a basis for determining an allocation of a settlement payment between claimed damages for lost profit and for lost capital, the taxpayer has not met his burden of proving a recovery of capital. See Aluminum & Metal Serv., Inc. v. Commissioner, T.C. Memo. 1965-129, affd. 358 F.2d 138 (7th Cir. 1966).  Petitioner has not shown what portion, if any, of the settlement payments from Marine Builders, Inc., was for lost value and not lost income. We accordingly sustain respondent's determination that they were taxable income.

### Darling Yachts, Inc.

Petitioner received payments from Darling Yachts, Inc., in 1996 and 1997 and did not report those payments as income.  As with the Marine Builders, Inc., settlement, petitioner argues that the Darling Yachts, Inc., payments were a return of capital. In the Darling Yachts, Inc., complaint, petitioner sought damages for breach of warranty, failure to complete the vessel, and loss of income.  The agreed judgment settling the matter does not indicate the purpose or nature of the settlement payments. Petitioner has not shown what portion, if any, of the settlement payments he received from Darling Yachts, Inc., was attributable to damages for lost value or lost profits from its failure to complete the vessel.  Accordingly, we conclude that petitioner has failed to meet his burden of proof that there was a return of

capital; thus, the settlement payments from Darling Yachts, Inc., are taxable income, and respondent's determination is sustained. See id.

Net Operating Loss Carryback

Respondent determined that the adjustments determined for petitioner's 1994 taxable year eliminated the net operating loss that had been carried back from that year to 1991. As a consequence, respondent determined a deficiency of $4,323 for 1991. See Pesch v. Commissioner, 78 T.C. 100 (1982). Respondent's deficiency determination for 1994 has been sustained, thereby eliminating any net operating loss for that year. As a consequence, the deficiency determined for 1991 is also sustained. See id.; Toussaint v. Commissioner, T.C. Memo. 1984-25, affd. 743 F.2d 309 (5th Cir. 1984).

Fraud

Respondent determined that the underpayments of tax on petitioner's 1994, 1995, 1996, and 1997 returns, as well as his amended return for 1991, were due to fraud. To establish fraud, the Commissioner must show by clear and convincing evidence that there is an underpayment and that a portion of the underpayment is attributable to fraud. See sec. 7454(a); Rule 142(b); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989). If the Commissioner establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated

as attributable to fraud, except that portion which the taxpayer establishes by a preponderance of the evidence is not attributable to fraud. See sec. 6663(b); Marretta v. Commissioner, T.C. Memo. 2004-128; Peyton v. Commissioner, T.C. Memo. 2003-146.

Underpayment

We conclude that respondent has shown the existence of an underpayment in each year by clear and convincing evidence. With respect to 1994, petitioner has admitted that he failed to report $41,202 in gross income from his charter business. Had this amount been reported, it would have eliminated the net operating loss that petitioner carried back to 1991. As a consequence, the underpayment for 1991 has also been established under a clear and convincing standard. See Toussaint v. Commissioner, supra. With respect to 1995, petitioner has admitted that he failed to report charter business gross income of $182,812 and income from a finder's fee of $85,119.

With respect to 1996 and 1997, we have found that petitioner failed to demonstrate error in respondent's determination that he understated the gain from the sale of yachts in those years by $527,074 and $615,119, respectively. While a mere failure by petitioner to show error in respondent's determination is not a sufficient basis for fraud, Petzoldt v. Commissioner, supra at 700; Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982);

Otsuki v. Commissioner, 53 T.C. 96, 106 (1969), respondent has marshaled considerable affirmative evidence that petitioner substantially overstated the basis reported with respect to the sale of the Sir Winston and Sir Winston II in 1996 and 1997, respectively.

In an effort to verify petitioner's reported basis, respondent subpoenaed the records of the checking and credit card accounts that petitioner indicated he maintained during the relevant periods.  Based on petitioner's representation that the capital improvements he made to the Sir Winston and Sir Winston II were all made within the 1-year period following his acquisition of each vessel, respondent undertook an analysis of all expenditures made during those periods through the checking and credit card accounts then held by petitioner[19] to identify expenditures that could have been for capital improvements to the vessels.  With respect to the checking accounts, respondent sought to identify checks for possible capital improvements by excluding all checks that could not have been for that purpose. Respondent first excluded all checks that, on their face, could not have been for capital improvements, such as checks for utilities, docking fees, taxes, insurance, and the like. Respondent was able to exclude other checks based on evidence in

---

[19] We note that respondent's analysis covered records of joint checking accounts that petitioner held with his ex-wife, including those that she conceded taking.

the record, such as matching the checks to petitioner's monthly
mortgage payment on his residence or to payments, such as for
marine architectural services, that had already been incorporated
in respondent's determination of petitioner's basis.  The
remaining checks that could not be excluded on the foregoing
basis were treated as possible payments for capital improvements
to the vessels.

On the basis of this methodology, respondent concluded that
petitioner could not have expended more than $46,507 for capital
improvements to the Sir Winston from the four checking accounts
he held during the 1-year period following the vessel's
acquisition.[20]  Upon careful review, we are convinced that
respondent's methodology is reasonable.[21]  Petitioner has not

---

[20] This is the total from respondent's description of his
analysis of the four checking accounts in the requested findings
of fact in his brief.  Elsewhere in the text of his brief, he
omits the checks from one account at the First Indiana Bank,
totaling $2,543.  By using the total from respondent's requested
fact findings, we have resolved any ambiguity in petitioner's
favor.

[21] In his analysis of petitioner's SunTrust Bank checking
account, respondent did not consider checks for less than $800,
based on the fact that petitioner's capital improvements to the
vessels that had been substantiated were virtually always in
excess of that figure.  We are persuaded that this methodological
assumption was reasonable in the circumstances.  In any event,
even if all checks under $800 were treated as expended for
capital improvements, there would still be substantial amounts of
claimed basis in the Sir Winston and Sir Winston II unaccounted
for, because the totals of the checks written for less than $800
during the 1-year periods after the acquisition of the Sir
Winston and Sir Winston II were $86,010 and $98,278,

(continued...)

disputed the methodology, other than to disagree with its conclusions. Our own review reveals a few errors in its application, however. Respondent does not appear to have accounted for a $143,818 cashier's check drawn on one of petitioner's checking accounts. We also disagree with the treatment of three minor checks, two to "Costco" totaling $2,298 and a $3,176 check to a payee that we find illegible, all of which respondent excluded from the class of checks that could have been for capital improvements. Giving petitioner the benefit of any doubt, by treating the foregoing four checks as having possibly been for capital improvements, raises by $149,292 respondent's total for possible capital improvements expenditures through the checking accounts, from an amount not exceeding $46,507 to an amount not exceeding $195,799. In comparison, the amount of basis in the Sir Winston that petitioner has been unable to substantiate is $527,074.

Respondent's analysis also sought to identify the possible capital improvements expenditures made through the credit card accounts held by petitioner during the 1-year period following

---

[21](...continued)
respectively.

Similarly, in the case of one of petitioner's First Indiana Bank checking accounts, respondent did not consider checks for less than $301. However, treating all such checks as expenditures for capital improvements would have produced an increase of only $1,396 in possible capital improvements.

his acquisition of the Sir Winston.  While we find respondent's effort to classify the credit card expenditures less persuasive, this is no help to petitioner.  Even if all credit card expenditures during the period ($29,917) are treated as having been for capital improvements (a highly unrealistic assumption in petitioner's favor), this would still leave a substantial amount of claimed basis in the Sir Winston unaccounted for.  That is, if the $29,917 in petitioner's credit card expenditures is added to the $195,799 in checks that could have been for capital improvements, the $225,716 total still falls substantially short of accounting for the $527,074 in reported basis that petitioner has not been able to substantiate.  In sum, even under assumptions that are extremely favorable to petitioner, the possible capital improvement expenditures traceable through petitioner's checking and credit card accounts cannot explain almost $300,000 in claimed basis.  This leaves only cash transactions to account for this amount, a premise we do not believe.  Consequently, we conclude that respondent has shown by clear and convincing evidence that petitioner had an underpayment for 1996, attributable to a failure to report a substantial amount of gain on the sale of the Sir Winston.[22]

_____

[22] In reaching our conclusion that respondent has clearly and convincingly shown that petitioner overstated his basis in the Sir Winston by a substantial amount, we are mindful of the fact that petitioner took possession of the vessel before the

(continued...)

A similar result obtains with respect to the Sir Winston II.
Respondent's analysis of the two checking accounts and one
brokerage account held by petitioner during the 1-year period
following his acquisition of the Sir Winston II concluded that
petitioner could not have expended more than $72,315 from these
sources for capital improvements to that vessel.  Upon review of
respondent's analysis, we conclude that five additional checks
that were not treated by respondent as possible capital
improvements expenditures should have been so treated.  Those
checks include two checks to "Costco" totaling $1,901, two checks
to "Henry Lee Co." totaling $2,226, and a check to "Weaver &
Weaver, P.A." for $2,905.  We conclude that the payees on these
checks do not provide a sufficient basis to exclude them as
possible expenditures for capital improvements.  The total of the
foregoing additional checks is $7,032, which when added to
respondent's calculation brings the total of possible capital
expenditures from petitioner's checking and brokerage accounts to

[22](...continued)
builder had completed it.  Nonetheless, a marine survey conducted
3 days before petitioner took possession found that the vessel
was 95 percent complete, and a U.S. Coast Guard certificate of
inspection, qualified by minor deficiencies, was issued at the
same time.  Moreover, petitioner settled his lawsuit against the
builder for $65,000, a figure that is inconsistent with the claim
that expenditures exceeding $500,000 were required to complete
the Sir Winston after petitioner took possession.  Thus, we do
not believe that the somewhat unfinished state of the Sir Winston
when petitioner took possession can account for the remainder of
the $527,074 in claimed, but unsubstantiated, capital
improvements.

$79,347.  As with the <u>Sir Winston</u>, we make the assumption favorable to petitioner that the entire $54,689 of his credit card expenditures during the 1-year period following acquisition of the <u>Sir Winston II</u> was expended for capital improvements to that vessel.  Thus, after the petitioner-favorable adjustments that we make to respondent's analysis, the maximum in expenditures from his checking, brokerage, and credit card accounts that could have been for capital improvements to the <u>Sir Winston II</u> is $134,036, or $522,783 less than the $656,819 in reported basis that petitioner has not substantiated.  We do not accept the premise that cash transactions can account for this discrepancy, and consequently we conclude that respondent has shown by clear and convincing evidence that petitioner had an underpayment for 1997, attributable to a failure to report a substantial amount of gain on the sale of the <u>Sir Winston II</u>.

### Fraudulent Intent

"Fraud is established by proving that the taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax." <u>Recklitis v. Commissioner</u>, 91 T.C. 874, 909 (1988).  The existence of fraud is a question of fact established by consideration of the entire record.  <u>Petzoldt v. Commissioner</u>, 92 T.C. at 699; <u>Estate of Pittard v. Commissioner</u>, 69 T.C. 391 (1977).  Direct proof of fraud is seldom available; therefore,

fraud may be proved by circumstantial evidence and reasonable inferences from the facts. Petzoldt v. Commissioner, supra; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The courts have recognized numerous indicia or "badges" of fraud, including the following: (1) A pattern of underreporting income; (2) maintaining inadequate records; (3) giving implausible or inconsistent explanations of behavior; (4) making false entries; (5) dealing in cash; (6) engaging in illegal activities; and (7) the lack of credibility of taxpayer's testimony. Spies v. United States, 317 U.S. 492, 499 (1943); Conti v. Commissioner, 39 F.3d 658, 662 (6th Cir. 1994), affg. and remanding on other grounds 99 T.C. 370 (1992) and T.C. Memo. 1992-616; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Laurins v. Commissioner, 889 F.2d 910 (9th Cir. 1989), affg. Norman v. Commissioner, T.C. Memo. 1987-265; Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Korecky v. Commissioner, 781 F.2d 1566 (11th Cir. 1986), affg. T.C. Memo. 1985-63; Bingham v. Commissioner, T.C. Memo. 1998-102, affd. without published opinion 188 F.3d 512 (9th Cir. 1999). Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia constitutes persuasive circumstantial evidence of fraud. Petzoldt v. Commissioner, supra at 700. Further, the taxpayer's background, including his sophistication, experience, and education may be considered

circumstantial evidence of fraud. Korecky v. Commissioner supra; Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972)(taxpayer's business success indicated more than gross negligence), affg. T.C. Memo. 1970-274; Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

Petitioner had a clear pattern of underreporting income, as the previously described understatements spanning 1994 through 1997 document.

Petitioner's records were inadequate with respect to his basis in the yachts and the real estate he sold, as well as his charter business. Moreover, his testimony concerning his former spouse's theft of his records lacked credibility, and other evidence concerning his records shows that his account is implausible and inconsistent. Notably, petitioner has failed, through the time of trial, to make any serious effort to reconstruct his records. Though he claims his ex-wife took records, he did not subpoena her to obtain them. He generally failed to contact any vendors of the goods or services that underlay his unsubstantiated basis claims; in one instance where a contact was made, petitioner did not disclose the retrieved records to respondent. Petitioner did not offer the testimony of any vendors. Petitioner claimed that his efforts to obtain records from his financial institutions were unsuccessful, whereas respondent was able to obtain them. Instead of making a

good faith attempt at reconstruction, petitioner merely rested on his claim that his records had been stolen.  We believe that a taxpayer in petitioner's position, facing challenged basis claims exceeding $1 million in the aggregate, would have made a more serious effort to reconstruct <u>unless</u> he knew that such efforts would tend to disprove his claims.  The records of petitioner's financial transactions that have been proffered in this case were generally obtained through the efforts of respondent alone and substantially rebut petitioner's basis claims.

In addition, petitioner's claim that the records substantiating his basis had been stolen was undermined when, at trial, he proffered various invoices purporting to be substantiation of costs of later-built yachts that, upon close inspection, bore dates that fell within the time period for which records were claimed to have been taken.  Moreover, the repeated instances where the dates on invoices proffered as evidence had been altered is further evidence of petitioner's fraudulent intent.

We also take account of the fact that petitioner was convicted of felony forgery in 1996 for forging the signatures of persons residing near the country club he operated on that business's application for a liquor license.

In an apparent effort to address the pervasive lack of records in this case, petitioner has also sought to portray

himself as unsophisticated or careless with respect to recordkeeping. The evidence, however, belies the notion that petitioner was an unskilled or indifferent recordkeeper. The bookkeeper for his condominium development company credibly testified that when she raised questions concerning whether the company should pay what were clearly invoices for yacht expenses, she was not only specifically ordered by petitioner to pay them, but was further instructed as to the specific ledger accounts in which to record the expenditures so that they would appear to be expenses incident to the construction or maintenance of the condominiums. The evidence shows that petitioner was a knowledgeable, but deceitful, recordkeeper. Cf. Korecky v. Commissioner, supra (rejecting claim of recordkeeping inexperience as fraud defense).

Petitioner also claims that he was distraught and mentally impaired during 1995 and 1996, due to the breakup of his marriage and his conviction for felony forgery. Putting aside the fact that this claim does not address 1994 or 1997, we reject it because it is contradicted by substantial evidence. During the claimed impairment, petitioner was operating three successful businesses in two States, generating more than $3.5 million in revenue.[23] During the years in issue, he also negotiated the

_____

[23] WDI reported gross receipts of $1,342,216 and $1,624,352 in 1995 and 1996, respectively. Petitioner admitted to gross
(continued...)

profitable sale of three yachts and real estate worth more than $5.7 million. He also brought two lawsuits that resulted in significant monetary settlements to him. In sum, we are not persuaded that petitioner was experiencing any significant incapacity during the period that fraud has been alleged. To the contrary, the record amply demonstrates that petitioner was an astute businessman. In this context, such a background is further circumstantial evidence that his underpayment of taxes was due to fraud.

We conclude that, viewed as a whole, the evidence establishes that a portion of the underpayment in each year at issue was attributable to fraud and that petitioner has failed to show that any portion of the underpayments was not attributable to fraud. Petitioner's efforts to provide a nonfraudulent explanation for his actions are unconvincing. The sheer magnitude of the overstatements of basis and petitioner's inconsistent and implausible explanations of his lack of substantiation strongly suggest that petitioner was attempting to avoid paying tax on the gain from the sale of the yachts. While he claims on brief that the lawsuit proceeds were a return of

---

[23](...continued)
receipts from his charter business of $399,239 in 1995 and $318,471 in 1996. The total 2-year revenues from these two enterprises are $3,684,278. Petitioner's 1995 and 1996 receipts for the Winston Yacht and Country Club, Inc., are not in record and are not included in this total.

capital, he did not disclose their receipt to his return preparer so that adjustments pursuant to this treatment could be made. As for petitioner's failure to report more than $200,000 in charter income that he admits receiving in 1994 and 1995, or a finder's fee exceeding $85,000 that he admits receiving in 1995, petitioner has not even offered an explanation, other than his general claim of impairment.

We accordingly sustain respondent's determination of fraud for 1994, 1995, 1996, and 1997. A taxpayer is liable for a civil fraud penalty on a deficiency that arises when the taxpayer carries back a fraudulent loss. Toussaint v. Commissioner, T.C. Memo. 1984-25. Therefore, it follows from our conclusion regarding fraud for 1994 that the underpayment in 1991 was also due to fraud, as the underpayment in 1991 resulted from the carryback of a fraudulent loss from 1994. The fraud penalty for 1991 is therefore also sustained.[24]

To reflect the foregoing,

Decisions will be entered

under Rule 155.

_____

[24] Our conclusion that the underpayments for 1991, 1994, 1995, 1996, and 1997 were attributable to fraud disposes of petitioner's claim that the period of limitations for assessment of 1991, 1994, 1995, 1996, and 1997 income taxes has expired, see sec. 6501(c)(1); Badaracco v. Commissioner, 464 U.S. 386, 394-396 (1984), as well as respondent's allegations in the alternative that petitioner is liable for accuracy-related penalties under sec. 6662(a) for the years in issue.