T.C. Memo. 2005-55

UNITED STATES TAX COURT

JAMES O. JONDAHL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13385-02.                Filed March 24, 2005.

<u>Jon J. Jensen</u>, for petitioner.

<u>Inga C. Plucinski</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's 1990, 1991, 1992, and 1993 Federal income taxes of
$25,438, $2,883, $9,883, and $35,876, respectively.  Respondent
also determined fraud penalties under section 6663[1] for 1990,

_____

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code as amended, and all Rule references are
to the Tax Court Rules of Practice and Procedure.

1991, 1992, and 1993 of $19,078.50, $2,162.25, $7,412.25, and $26,907, respectively. After concessions by the parties, the issues for decision are:

(1) Whether assessment of petitioner's 1990, 1991, 1992, and 1993 taxes is barred by the period of limitations in section 6501(a). Because we find that petitioner filed false and fraudulent returns with the intent to evade tax for 1990, 1991, 1992, and 1993, we hold that assessment is not barred;

(2) whether Taxman, Inc. (Taxman), and West Fargo Investment Corp. (WFIC) should be disregarded because they are mere alter egos of petitioner. We hold that they should not;

(3) whether petitioner earned real estate commissions of $56,196, $18,552, $1,566, and $139,080 in 1990, 1991, 1992, and 1993, respectively. We hold that petitioner earned a real estate commission of $1,566 in 1992 and that petitioner did not earn real estate commissions in 1990, 1991, or 1993;

(4) whether petitioner realized capital gain of $25,000 from the sale of Jondahl Insurance in 1990 and commissions from the sale of crop hail insurance in 1990 and 1991 of $12,882 and $3,142, respectively. We hold that petitioner received capital gain of $14,962 and insurance commissions of $10,038 in 1990, and that petitioner did not earn insurance commissions in 1991;

(5) whether in 1990 petitioner realized capital gain of $20,244 from the repossession of an apartment complex called Lone Tree Manor. We hold that he did;

(6) whether petitioner had unreported income in 1990 of $6,000 from the payment of a settlement judgment by Taxman, $310 from the payment to petitioner's attorney by Taxman, $2,147 from a repayment of a loan by Taxman, and $3,000 in cash taken from Taxman. We hold that he did;

(7) whether petitioner had unreported income in 1991 of $509 (the value of a stereo transferred from Taxman to petitioner's girlfriend), $2,052 from a check issued to petitioner by Taxman, $2,086 from Taxman's payment for petitioner's furniture, and $3,000 in cash taken from Taxman. We hold that petitioner had unreported income of $2,052 from a check issued to petitioner by Taxman, $2,086 from Taxman's payment for petitioner's furniture, and $3,000 in cash taken from Taxman;

(8) whether petitioner had unreported income in 1992 of $1,904 from Taxman's payment for petitioner's furniture, $15,000 from Taxman's payment of petitioner's income taxes, $3,000 in cash taken from Taxman, and $10,931 from a certificate of deposit (CD) in the name of Western Realty Partners, L.P. (WRP). We hold that petitioner had unreported income of $3,000 in cash taken from Taxman and $10,931 from a CD in the name of WRP;

(9) whether petitioner had unreported income in 1993 of $310 from Taxman's payment for a repair of petitioner's wife's car, $7,000 from WFIC's payment to petitioner's sister, $28,660 from WFIC's purchase of a car, and $3,000 in cash taken from Taxman. We hold that petitioner had unreported income of $310 from Taxman's payment for a repair of petitioner's wife's car, $7,000 from WFIC's payment to petitioner's sister, $18,660 from WFIC's purchase of a car, and $3,000 in cash taken from Taxman;

(10) whether petitioner is entitled to claim head-of-household filing status in 1990. We hold that he is not;

(11) whether petitioner is liable for self-employment tax on his unreported crop hail insurance commission in 1990 and real estate commission in 1992. We hold that he is; and

(12) whether the understatement in each of 1990, 1991, 1992, and 1993 is subject to the fraud penalty under section 6663(a). We hold that petitioner is liable for the fraud penalty under section 6663(a) with respect to unreported income of $3,000 in each year.

## FINDINGS OF FACT

Some of the facts are stipulated. The stipulations of fact and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner resided in Fargo, North Dakota.

Petitioner married Lori J. Jondahl (Lori) on August 11, 1983. In 1986, petitioner and Lori bought a house in Moorhead, Minnesota, in which they lived until June 1990. In June 1990, petitioner moved out of the Moorhead house and into an apartment in West Fargo, North Dakota, where he lived until December 31, 1993. On July 9, 1991, petitioner and Lori were granted a divorce. Lori was granted custody of the couple's daughter. On October 30, 1993, petitioner married Mary Lee Jondahl (Mary). Petitioner and Mary are still married.

I. Petitioner's Business Activities

A. Petitioner's Tax Preparation Business

In January 1976, petitioner began preparing Federal and State tax returns as a sole proprietorship under the name Jondahl Tax Service, and later under the name Jondahl Financial Services (JFS). In 1978, petitioner became an Internal Revenue Service (IRS) enrolled agent authorized to practice before the IRS.

B. Taxman

In October 1986, Taxman was incorporated by David Garaas, petitioner's attorney. Taxman's initial directors were Tony Baasch, an associate of petitioner's, and Gerald Owen Jondahl (Mr. Jondahl), petitioner's father. At Taxman's first board of directors meeting, Mr. Jondahl was elected president, Mr. Baasch was elected vice president, and Gladys Jondahl (Mrs. Jondahl), petitioner's mother, was elected secretary and treasurer.

Petitioner ran the day-to-day operations of Taxman.  Mr. Garaas and Mr. and Mrs. Jondahl were not involved in Taxman's day-to-day operations.

Taxman's business consisted of preparing Federal and State tax returns, providing tax advice, and keeping financial books and records.  Taxman employed several people at any one time whose duties included preparation of tax returns, accounting work, maintenance of accounts receivable and payable, making bank deposits, signing checks, and receptionist tasks.  Taxman maintained bank accounts in its name, kept corporate records, and filed corporate tax returns for the years in issue.

In July 1985, petitioner was sued individually and as sole proprietor of his tax preparation business.  Two of JFS's clients sued petitioner in connection with a tax shelter investment.  In September 1986, a settlement was reached in which petitioner initially agreed to pay each couple $6,000.  In connection with the 1986 lawsuit against him, petitioner was deposed in July 1987.  During the deposition, petitioner stated that Taxman was organized to take over the assets and liabilities of JFS. Petitioner testified in the deposition that he had transferred office equipment worth approximately $10,000, accounts receivable worth $3,000, and two bank loans totaling approximately $31,000 to Taxman.  Petitioner also stated that no written agreement existed evidencing the takeover of JFS by Taxman.  After the 1987

deposition, the clients who had sued petitioner agreed to accept $3,000 each in satisfaction of petitioner's obligations to them. The two $3,000 payments were made by Taxman in 1990. Petitioner did not include the $6,000 paid by Taxman as income to him on his 1990 Federal income tax return.

Each of Taxman's corporate returns for its taxable years ending September 30, 1990, 1991, 1992, and 1993, was completed by petitioner. Mr. Jondahl is listed as the majority stockholder on each return. Petitioner determined Taxman's income for its corporate returns from Taxman's bank deposits. During each year at issue, approximately $3,000 of Taxman's cash receipts was not deposited in Taxman's bank accounts. Petitioner took possession of the cash but did not keep records of how it was spent. Some of the cash was used by petitioner to pay personal expenses. Petitioner did not report the cash amounts on his individual tax returns. Most of Taxman's expenses, even amounts less than $2, were paid by check. During the 4 years in issue, Taxman issued over 500 checks to various eating establishments, to Sam's Wholesale Club, and for office supplies, snacks, and postage.

In September 1992, after petitioner was notified that the IRS was auditing Taxman's 1990 return, he typed up minutes of annual directors meetings that he claims took place on October 5, 1987, October 2, 1989, and October 8, 1990. Petitioner claims that he took handwritten notes of these meetings. The minutes

reflect that Monica Ramsden, an employee of Taxman, was elected secretary during the meeting that allegedly took place on October 5, 1987, and that she remained in that capacity until at least October 7, 1991. Dianna Jilek, an employee of Taxman from 1988 until 1992, was designated an officer of Taxman and WFIC on the companies' annual reports. Ms. Jilek did not know she was designated an officer until she saw her name on Taxman and WFIC's annual reports.

Taxman issued Forms W-2, Wage and Tax Statement, to petitioner for each year in issue. Taxman paid petitioner $12,000, $20,186, $18,208, and $25,008 in 1990, 1991, 1992, and 1993, respectively.

On September 30, 1994, Mr. Jondahl died. At the time of his death, Mr. Jondahl owned 95 percent of Taxman's stock. Mr. Jondahl left his entire estate to Mrs. Jondahl. In November 1995, petitioner and Mrs. Jondahl sold Taxman to an unrelated third party.

C. WFIC and Petitioner's Real Estate Business

On October 12, 1978, petitioner received his real estate agent's license. In January 1985, petitioner began selling real estate as an agent for WFIC. WFIC was organized in 1949 as a real estate corporation by Lester Smith. Mr. Smith served on WFIC's board of directors and as its president from its incorporation until 1990 or 1991. Mr. Smith died in 1993.

Sometime around 1988, Mr. Smith transferred the stock of WFIC to petitioner or petitioner's sister and brother-in-law[2] and moved WFIC to Taxman's office space. Petitioner ran the day-to-day operations of WFIC from 1988 until 1994. While petitioner ran WFIC, WFIC's primary business was the sale of commercial real estate. WFIC maintained a checking account, a savings account, and an Interest on Real Estate Trust Account (trust account) throughout the years in issue. On September 14, 1990, the North Dakota Real Estate Commission (NDREC) granted petitioner's application to be a real estate broker for WFIC. WFIC did not hold regular shareholders or directors meetings. During the years at issue, WFIC employed two real estate agents in addition to petitioner. WFIC paid each agent commissions the agent earned brokering transactions for WFIC. Certain of Taxman's employees, including petitioner, performed work for WFIC and were paid for these services by Taxman. The Taxman employees who also worked for WFIC did not keep track of the time they spent working for WFIC. During 1990, 1991, 1992, and 1993, WFIC transferred at

---

[2]Petitioner testified that Mr. Smith transferred the WFIC stock to petitioner's sister and brother-in-law because petitioner's attorney advised him not to own stock in light of the lawsuit against him and a potential lawsuit from his former wife. Respondent alleges that the WFIC stock was transferred to petitioner's sister and brother-in-law as nominees for petitioner. Because the identity of the true owner of WFIC's stock does not affect our determinations herein, we do not address this discrepancy.

least $190,240 to Taxman. Petitioner controlled the amounts that WFIC transferred to Taxman.

On November 26, 1990, WFIC registered the trade name "Epic Real Estate" with the State of North Dakota. In 1990, petitioner inquired of the NDREC whether it was permissible for him to advertise under the name Epic Real Estate as a division of WFIC. He was informed that it was, but that he could not advertise solely as Epic Real Estate while operating through a corporation. In a letter dated February 19, 1992, petitioner informed the secretary of the NDREC that "Epic Real Estate" would no longer be a division of WFIC but a sole proprietorship under petitioner's broker's license. On February 19, 1992, petitioner filed an official notice of change of address and name with the NDREC, showing a change of business name from "West Fargo Investment Corporation d/b/a Epic Real Estate" to "Epic Real Estate". Also in February 1992, petitioner changed the name on WFIC's trust account, without the knowledge or approval of WFIC's shareholders or directors, from "West Fargo Investment Corporation d/b/a Epic Real Estate" to "James O. Jondahl d/b/a Epic Real Estate". Petitioner renewed his broker's license for 1993 using the name "Epic Real Estate". On September 24, 1993, petitioner changed the business name with the NDREC back to "West Fargo Investment Corporation d/b/a Epic Real Estate".

During the years in issue, petitioner, WFIC, or Epic Real Estate brokered numerous real estate transactions.  In some of these transactions, a commission was transferred from WFIC's trust account to its checking account.  In 1990, commissions of $38,446 from two transactions were transferred from WFIC's trust account to WFIC's checking account.  Additional commissions of $17,700 were paid by check to either petitioner or WFIC.  In 1991, commissions of $18,552 from two transactions were transferred from WFIC's trust account to WFIC's checking account. In 1992, a brokerage fee of $1,566 was paid by check made out to petitioner.  In 1993, a brokerage fee of $28,000 was transferred from WFIC's trust account to its checking account, and a commission of $102,080.25 was paid by check to Epic Real Estate.

WFIC filed Forms 1120, U.S. Corporation Income Tax Return, for its taxable years ending December 31, 1990, 1991, 1992, and 1993.  Petitioner prepared those returns.  WFIC reported the commissions from petitioner's real estate activities in 1990, 1991, 1992, and 1993 as income on its corporate tax returns for those years.  Respondent does not dispute that WFIC reported all of the real estate commissions on its corporate returns for the years in issue.  The commission income was offset by net operating losses that WFIC held at the time petitioner began running WFIC.  WFIC did not pay petitioner the real estate commissions; petitioner's only salary was from Taxman.

D.  Crop Hail Insurance Business

On March 11, 1977, petitioner was licensed as an insurance agent.  From 1977 to December 1990, petitioner sold crop hail insurance under the names Jondahl Insurance and Jondahl Insurance Agency (Jondahl Insurance).  Jondahl Insurance entered into several contracts with Farmer's Mutual Crop Hail Insurance Co. (Farmer's Mutual) between 1983 and 1986 that authorized Jondahl Insurance to act as an agent of Farmer's Mutual in certain counties.  Jondahl Insurance also entered into an agency contract with Old Republic Insurance Co. in 1989.  A Farmer's Mutual 1990 policy register reflects that Jondahl Insurance earned $12,881.70 in commissions from Farmer's Mutual during that year.  The Farmer's Mutual 1991 policy register reflects that Jondahl Insurance earned $3,141.95 in commissions from Farmer's Mutual during that year.  Petitioner did not report any commissions earned from Farmer's Mutual for the sale of crop hail insurance on his individual 1990 and 1991 Federal income tax returns.

In 1990, Gary Ihry of Valley Crop Insurance purchased Jondahl Insurance for $25,000.[3]  Mr. Ihry paid Jondahl Insurance $14,962 in 1990 in partial satisfaction of the purchase price. The parties stipulated that Farmer's Mutual paid Jondahl

---

[3]It is not apparent in the record how Jondahl Insurance earned commissions in 1991 from Farmer's Mutual after selling its crop hail insurance business to Mr. Ihry in 1990.  The record does not contain Forms 1099 evidencing that Farmer's Mutual actually paid petitioner these commissions.

Insurance $10,038 in 1990 in satisfaction of the remainder of the purchase price, in accordance with the terms of the sale. Petitioner deposited the proceeds from the sale in WFIC's checking account. Petitioner did not report any capital gain from the sale to Mr. Ihry on his 1990 individual Federal income tax return.

E. <u>Lone Tree Manor Apartments</u>

On April 1, 1987, petitioner purchased Lone Tree Manor apartment complex from Investors Real Estate Trust (IRET). IRET held the mortgage on Lone Tree Manor until 1990. The income and expenses related to the operation of Lone Tree Manor were reported on petitioner and Lori's joint Federal income tax returns for 1987 and 1988. Lori reported the income and expenses for Lone Tree Manor on her individual 1989 income tax return. In November 1990, IRET repossessed Lone Tree Manor. Petitioner did not report any gain resulting from the repossession of Lone Tree Manor on his 1990 Federal income tax return. WFIC reported capital gain of $22,028 from the sale of Lone Tree Manor on its 1990 Form 1120.

II. <u>Other Expenses</u>

Petitioner, Taxman, and WFIC each maintained bank accounts. Petitioner had signatory authority on all these accounts.

A.  <u>1990</u>

In 1990, Taxman paid $310 to Garry Pearson, an attorney whom petitioner consulted regarding his 1982, 1983, and 1984 tax returns.  Also in 1990, Taxman made two payments totaling $2,147 to West Far-Mor Credit Union in satisfaction of a 1989 loan to petitioner.  Petitioner did not report either payment as income on his 1990 tax return.

B.  <u>1991</u>

In January 1991, Taxman issued two checks to petitioner totaling $2,052.  Petitioner did not report the $2,052 as income on his 1991 tax return.

Also in January 1991, petitioner bought several pieces of furniture from Conlin's Furniture (Conlin's).  The total price of the furniture was $4,034.10.  The cost of the furniture was charged to petitioner's Visa card in January and April 1991.  Taxman made all the payments on petitioner's Visa during 1991 and 1992.  For 1991 and 1992, Taxman paid $2,086 and $1,904, respectively, toward the furniture purchase.[4]  Petitioner did not include the amount paid for the furniture from Conlin's as income on his 1991 or 1992 personal income tax return.

---

[4]The notice of deficiency states that Taxman paid only $1,904.  However, the credit card statements reflect that Taxman paid $1,948.10 toward the furniture purchase in 1992.  For simplicity's sake, we refer to the 1992 amount as $1,904 as stated in the notice of deficiency.

Taxman occasionally accepted equipment from one of its clients, Site on Sound Car and Home Electronics (Site on Sound), in lieu of payment on Site on Sound's balance due. In May 1991, petitioner received a home stereo system as partial payment of Site on Sound's balance due. The stereo was valued at $509. Petitioner gave the home stereo system to his girlfriend, Melodie Lane. He did not report the $509 as income on his personal tax return for 1991. Ms. Lane worked in an office of Taxman Express, a subsidiary of WFIC, for 1 month in early 1992. Taxman Express was a business opened by petitioner in 1991 in order to prepare and e-file tax returns for walk-in customers. Ms. Lane was never employed by Taxman.

C. 1992

On October 1, 1990, petitioner formed Western Realty Partners, L.P.-I (WRP). WFIC was the general partner of WRP and held a greater-than-95-percent interest in WRP. On October 5, 1990, Valis R. Garceau, a client of petitioner's and Taxman's, gave petitioner $10,000 to purchase rental real estate on her behalf. Petitioner deposited the $10,000 in WFIC's trust account. On the same day, $10,000 was withdrawn from WFIC's trust account by check payable to WRP. A memo on the check read "V. Garceau CD". Petitioner does not dispute that the check was used to purchase a $10,000 CD. On May 6, 1991, WRP liquidated the CD and deposited the funds, $10,418.89, into a new money

market account opened by WRP that same month.  No other deposits were made into the money market account.  On April 20, 1992, petitioner closed the money market account and withdrew the balance ($10,930.58).  Petitioner deposited the $10,930.58 into his personal bank account.  Petitioner did not report the $10,930.58 as income on his 1992 income tax return.

On May 28 and July 24, 1992, Taxman issued checks for $5,000 and $10,000, respectively, to petitioner.  Petitioner used these checks to purchase cashier's checks payable to a West Fargo law firm to pay petitioner's personal 1983 and 1984 income tax liabilities.  Petitioner did not report the $15,000 as income on his 1992 income tax return.

D.  1993

On February 17, 1993, Taxman paid $310.43 to Schumacher Goodyear for repairs done in December 1992 to Mary's car, a 1991 Ford Probe.  Petitioner did not report the amount paid for the repairs as income on his 1993 income tax return.

On October 12, 1993, WFIC issued a check for $7,000 to petitioner's sister, Susan Schoeppach.  On October 20, 1993, Ms. Schoeppach wrote a check for $7,000 to Epic Real Estate.  The $7,000 Ms. Schoeppach paid Epic Real Estate was used as a downpayment on an apartment building that Ms. Schoeppach purchased.  Epic Real Estate brokered Ms. Schoeppach's purchase

of the apartment building and received a real estate commission of $9,000 for the sale in 1993.

On October 15, 1993, WFIC purchased a 1993 Buick Riviera (Buick). Mary's 1991 Ford Probe was traded in and its value was credited to the purchase of the Buick. The Buick was registered in Mary's name, and personalized license plates reading "PURRFCT" were requested for the Buick. Petitioner did not report the value of the Buick as income on his 1993 income tax return.

In 1994, petitioner represented on both a credit application and a Uniform Residential Loan Application that he and Mary owned Taxman, WFIC, and the Buick.

III. Petitioner's Criminal Conviction

On September 11, 1997, a jury convicted petitioner of intentionally filing false returns under section 7206(1) for 1990, 1991, 1992, and 1993 and of attempting to obstruct and impede the administration of internal revenue laws from 1985 through 1997 in violation of section 7212(a). The U.S. District Court for the District of North Dakota entered its judgment on December 30, 1997, sentencing petitioner to 6 months' imprisonment and ordering petitioner to pay the IRS $42,873.24 in

restitution.[5]  The District Court's judgment was affirmed by the U.S. Court of Appeals for the Eighth Circuit on August 6, 1999.

On May 22, 2002, respondent issued a notice of deficiency for petitioner's 1990, 1991, 1992, and 1993 years.  Petitioner timely filed a petition with the Court.

OPINION

I.   Expiration of the Period of Limitations

The first issue we must consider is whether the period of limitations for each of petitioner's 1990, 1991, 1992, and 1993 years expired before respondent issued the notice of deficiency on May 22, 2002.  Petitioner contends that the 3-year period in section 6501(a) expired and respondent's assessment is barred.  Respondent argues that the period of limitations in section 6501(a) does not apply pursuant to section 6501(c)(1) and (2) because petitioner filed false or fraudulent returns with the intent to evade tax for the years at issue.  Accordingly, our determination of whether the period of limitations remains open depends on whether petitioner committed fraud in the filing of his 1990, 1991, 1992, and 1993 returns.

---

[5]On Feb. 18, 1999, petitioner paid in full the $42,873.24 restitution ordered by the District Court.  The parties stipulated that the amount paid as restitution will be credited to any deficiencies for the years 1990, 1991, 1992, and 1993 after they are redetermined by the Court or agreed upon by the parties.

The determination of fraud for purposes of section 6501(c)(1) is the same as the determination of fraud for purposes of the penalty under section 6663. Neely v. Commissioner, 116 T.C. 79, 85 (2001); Rhone-Poulenc Surfactants & Specialties v. Commissioner, 114 T.C. 533, 548 (2000). Respondent has the burden of showing fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b).

Petitioner's conviction under section 7206(1) does not prove fraud; respondent must show that petitioner intended to evade tax in filing the false returns. See Wright v. Commissioner, 84 T.C. 636, 643 (1985). For Federal tax purposes, fraud entails intentional wrongdoing with the purpose of evading a tax believed to be owing. See Neely v. Commissioner, supra at 86. In order to show fraud, respondent must prove: (1) An underpayment exists; and (2) petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

A.   Underpayment of Tax

Respondent must first show by clear and convincing evidence that petitioner made an underpayment of tax in each of 1990, 1991, 1992, and 1993. Respondent may not rely on petitioner's failure to carry his burden of proof to sustain respondent's burden of proving fraud. See id. at 661. We conclude that

respondent has met this burden.  For 1990, petitioner conceded at trial that he understated his income by $950.  For 1992, petitioner conceded that he improperly deducted reimbursed medical expenses of $18,129.  In addition, for each of the years at issue, Taxman received $3,000 in cash receipts, and petitioner took possession of the cash.  The parties stipulated that the $3,000 of cash taken by petitioner each year was not deposited into Taxman's bank account.  Petitioner admits that he controlled all of the cash and that he used some of it to pay personal expenses.  He did not keep track of how the cash was spent, and he did not report the cash on his personal income tax returns.  Petitioner also admits that he used Taxman funds to pay for furniture.  Although petitioner asserts that some of the amounts Taxman spent on his personal expenses were intended to be loans from Taxman, respondent has shown that petitioner did not keep credible records of some of these purported loans.  Respondent has also shown that petitioner received income from the sale of his crop hail insurance business in 1990 that he did not report on his return.  We therefore conclude that respondent has presented clear and convincing evidence that petitioner underpaid his tax for 1990, 1991, 1992, and 1993.

B.  Fraudulent Intent

Because direct evidence of fraud is rarely available, fraud may be proved by circumstantial evidence and reasonable

inferences from the facts. Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989). Courts have developed a nonexclusive list of factors, or "badges of fraud", that demonstrate fraudulent intent. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992). These badges of fraud include: (1) Understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash. Id.; see also Spies v. United States, 317 U.S. 492, 499 (1943); Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence. Niedringhaus v. Commissioner, supra at 211. Respondent must prove fraud for each year at issue. See id. at 210; Ferguson v. Commissioner, T.C. Memo. 2004-90.

Respondent has shown by clear and convincing evidence that at least portions of the understatements on petitioner's returns for 1990, 1991, 1992, and 1993 are due to fraud. We believe petitioner took possession of Taxman's cash receipts for his own personal use with the intent to evade taxes on that income.

Petitioner instructed Ms. Jilek, who regularly deposited Taxman's income into its bank account, not to deposit Taxman's cash receipts into Taxman's bank account. Petitioner also reprimanded Ms. Jilek when, on occasion, she did deposit the cash. Instead, petitioner took possession of the cash, and he admits that he used some of the cash for his own personal expenses. He did not report the amounts used for personal expenses on his individual tax returns. Petitioner claims that some of the cash was used for business expenses, but Ms. Jilek credibly testified that although she remembers occasionally using cash to buy postage, she does not remember using cash for any other business expense. Petitioner did not keep track of how the cash was spent. Ms. Jilek was responsible for paying Taxman's bills, signing checks drawn on Taxman's account, and using petitioner's credit cards to pay business expenses. Respondent has shown that it was unusual for Taxman to pay its expenses in cash. Even small amounts were paid by check. Ms. Jilek could not remember petitioner or herself using cash to pay Taxman's expenses, except, sometimes, for postage. We do not find petitioner's testimony that he used the cash for business purposes credible, and we believe petitioner took the cash with the intent to conceal income.

Petitioner understated his income, maintained inadequate records of amounts he received from Taxman, and concealed income he received from Taxman. Petitioner is collaterally estopped

from arguing here that he did not willfully file a false income tax return for each of the years in issue.  We conclude that respondent has shown by clear and convincing evidence that petitioner filed false or fraudulent returns with the intent to evade tax for the years at issue.  Therefore, the 3-year period of limitations under section 6501(a) does not apply to any of petitioner's 1990, 1991, 1992, and 1993 years, and respondent is not barred from assessing any deficiencies in petitioner's taxes for those years.

II.  Burden of Proof[6]

Respondent's determinations in the notice of deficiency are presumed correct, and petitioner bears the burden of proving that respondent's determinations are incorrect.  See Rule 142(a); see Welch v. Helvering, 290 U.S. 111, 115 (1933); Page v. Commissioner, 58 F.3d 1342, 1347 (8th Cir. 1995), affg. T.C. Memo. 1993-398.  Respondent asserted adjustments in an amended answer that were not made in the notice of deficiency.  Respondent bears the burden of proof with respect to the items of adjustment not raised in the notice of deficiency.  See Rule 142(a); see Achiro v. Commissioner, 77 T.C. 881, 889 (1981).

---

[6]Sec. 7491 does not apply to this case because the examination of petitioner's 1990, 1991, and 1992 returns began before July 22, 1998.  See Internal Revenue Service Restructuring and Reform Act, Pub. L. 105-206, sec. 3001(a), 112 Stat. 726. The audit was subsequently expanded to include petitioner's 1993 tax year.

Therefore, respondent bears the burden of proving that: (1) Petitioner had unreported income in each of 1990, 1991, 1992, and 1993 of $3,000 by means of cash diverted from Taxman; (2) petitioner had unreported crop hail insurance commission income in 1990 and 1991 of $12,882 and $3,142, respectively; (3) petitioner had unreported real estate commission income of $28,098, $9,276, and $69,540 in 1990, 1991, and 1993, respectively; and (4) petitioner is liable for self-employment tax on his unreported commission income. Petitioner bears the burden of proof on the remaining adjustments.

III. Validity of Taxman and WFIC

Respondent first argues that petitioner used both Taxman and WFIC as his alter egos and they should be disregarded for tax purposes. Essentially, respondent asks us to find that Taxman and WFIC lack economic substance and are shams. Respondent points to petitioner's control over each corporation, his use of corporate funds to pay personal expenses, and his inconsistent representations of his positions in each corporation. Petitioner argues that he treated Taxman and WFIC as entities that were legally separate from himself.

Respondent does not argue that Taxman and WFIC were not properly organized under North Dakota law. However, even though a corporation is organized under the laws of a State, we may disregard it for Federal tax purposes if it is no more than a

vehicle for tax avoidance and void of a legitimate business purpose. Gregory v. Helvering, 293 U.S. 465 (1935); Aldon Homes, Inc. v. Commissioner, 33 T.C. 582, 596 (1959). While a taxpayer is free to adopt the corporate form of doing business, the corporation must have been organized for a substantial business purpose or actually engage in substantive business activity in order to be a viable business entity. Moline Props., Inc. v. Commissioner, 319 U.S. 436, 439 (1943) (stating that such business purposes include gaining an advantage under the laws of the State of incorporation, avoiding or complying with the demands of creditors, and serving the creator's personal or undisclosed convenience); Aldon Homes, Inc. v. Commissioner, supra at 597.

On the other hand, a corporation remains a separate taxable entity as long as the purpose for which it was formed "is the equivalent of business activity or is followed by the carrying on of business by the corporation". Moline Props., Inc. v. Commissioner, supra at 438-439. The degree of corporate business purpose required for recognition of a separate corporate existence is "extremely low." Strong v. Commissioner, 66 T.C. 12, 24 (1976), affd. 553 F.2d 94 (2d Cir. 1977); Lukins v. Commissioner, T.C. Memo. 1992-569.

The business purposes and activities of Taxman and WFIC were sufficient to require recognition of them as separate legal

entities.  At the time Taxman was incorporated, petitioner was being sued as an individual and as sole proprietor of his tax preparation business.  Petitioner's goal of obtaining limited liability for his tax preparation business by operating his business through Taxman is a sufficient business purpose for Taxman to be recognized as a separate entity.  See Moline Props., Inc. v. Commissioner, supra at 438-439.  In addition, Taxman had employees, filed tax returns, maintained books, records, and a bank account, and held assets and liabilities.  This level of ongoing business activity is also sufficient for the Court to conclude that Taxman was not a sham corporation.  See id.

WFIC was organized by Mr. Smith in 1949, and from 1988 until 1994, it operated a commercial real estate business.  Until 1991, Mr. Smith remained actively involved in WFIC's day-to-day business operations and had an office in Taxman's business space.  WFIC maintained books, records, and bank accounts and filed corporate tax returns.  Petitioner applied for his real estate broker's license as an employee of WFIC and ran most of his real estate transactions through WFIC's trust account.  WFIC also had other real estate agents working for it.  These business activities are sufficient to convince us that WFIC was not a sham and should be recognized as a corporate entity separate from petitioner. See id.

IV. Assignment of Income

Although we have concluded that Taxman and WFIC should be recognized as separate entities, WFIC's real estate commission income during the years at issue may nonetheless be taxable to petitioner under section 61 and the assignment of income doctrine. See Haag v. Commissioner, 88 T.C. 604, 610 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). A taxpayer may not assign income to a corporation with real and substantial business activity to avoid tax liability. Wilson v. United States, 530 F.2d 772, 778 (8th Cir. 1976). Two requirements must be fulfilled in order for a corporation, rather than its service-performer employee, to be considered the earner of the income and taxable thereon:

> First, the service-performer employee must be just
> that--an employee of the corporation whom the
> corporation has the right to direct or control in some
> meaningful sense. Second, there must exist between the
> corporation and the person or entity using the services
> a contract or similar indicium recognizing the
> corporation's controlling position. [Citations and fn.
> ref. omitted.]

Johnson v. Commissioner, 78 T.C. 882, 891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984).

Respondent argues that petitioner should have included on his personal tax returns the real estate commissions paid to WFIC during 1990, 1991, 1992, and 1993 because petitioner was the true earner of those commissions. Petitioner argues that WFIC earned the real estate commissions. Petitioner has the burden of proof

with respect to the $1,566 real estate commission earned in 1992. Because the notice of deficiency included half the real estate commission income earned during 1990, 1991, and 1993, petitioner has the burden of proof with respect to half of the real estate commissions at issue for those years. In his amended answer, respondent asserted the inclusion of the other half of the real estate commission amounts for 1990, 1991, and 1993; therefore, respondent has the burden of proof for half the real estate commissions for those years.

Petitioner did not present evidence at trial that he and WFIC executed an employment contract at any time. However, when petitioner applied for his real estate broker's license in 1990, he stated that he would be an "acting broker for a corporation", listing WFIC as his employer. Likewise, in correspondence between petitioner and members of the NDREC, petitioner acknowledged his relationship with WFIC and sought advice regarding the proper way to advertise. In addition, petitioner used WFIC's trust account to facilitate most of his real estate transactions.

In 1990 and 1991, all of petitioner's real estate transactions were brokered using WFIC's trust account, and the commission amounts were transferred to WFIC's general account at the conclusion of each transaction. These amounts were reported on WFIC's 1990 and 1991 corporate tax returns. Petitioner's

dealings with the NDREC and his customers as an employee of WFIC tend to show that for purposes of this test, WFIC had the right to direct petitioner as an employee. Petitioner's use of WFIC's bank accounts to facilitate the real estate transactions also demonstrates that WFIC was petitioner's employer for real estate matters. The use of WFIC's bank accounts and the presence of WFIC's name on documents such as settlement statements put WFIC's customers on notice that petitioner was operating as an employee of WFIC. This conclusion is supported by the fact that petitioner's customers wrote checks to WFIC or to Epic Real Estate as a division of WFIC. All these facts surrounding petitioner's operation of WFIC lead us to conclude that petitioner has met his burden of proving that WFIC was the true earner of the real estate commissions in 1990 and 1991, and respondent has not met his burden of showing that petitioner earned the 1990 and 1991 real estate commissions.

In February 1992, petitioner changed his business name with the NDREC from WFIC d/b/a Epic Real Estate to "James O. Jondahl d/b/a Epic Real Estate". He also changed the name on WFIC's trust account to Epic Real Estate. Petitioner completed one real estate transaction in 1992. The documents related to that transaction reference Epic Real Estate but do not reference WFIC. The commission, $1,566, was paid out of the WFIC/Epic Real Estate trust account to petitioner. Petitioner not only took formal

steps to separate his real estate activity in 1992 from WFIC but also acted as a sole proprietor in the 1992 transaction. These facts indicate that WFIC was not the true earner of the 1992 commission. Petitioner has not met his burden of proving that he did not earn the 1992 commission of $1,566.

In 1993, petitioner brokered one transaction for which a commission of $28,000 was transferred from WFIC's trust account to its checking account and another transaction for which Epic Real Estate received a commission of $102,080. The documents related to this second transaction, including a commission check, referred to Epic Real Estate as a division of WFIC. Petitioner deposited the proceeds from the transaction into WFIC's general account. Likewise, in November 1993, petitioner brokered a transaction for his sister in which Epic Real Estate received a commission of $9,000. Petitioner also deposited this check into WFIC's general account. These amounts were reported on WFIC's corporate tax return for 1993. Petitioner changed the business name with the NDREC back to "West Fargo Investment Corporation d/b/a Epic Real Estate" on September 24, 1993, indicating his intent to operate the real estate business through WFIC again. We conclude that, for the purpose of the 1993 real estate transactions, petitioner was again an employee of WFIC. Petitioner has met his burden of proving that WFIC was the true earner of the real estate commissions in 1993, and respondent has

not met his burden of showing that petitioner earned the real estate commissions.[7]

Petitioner argues that expenses associated with the real estate commission he earned should be taken into account. The burden of proving entitlement to deductions is on petitioner. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Because petitioner did not present any evidence that he paid any expenses or is entitled to any deductions against the real estate income, we conclude that the full amount of the 1992 commission, $1,566, is income to petitioner.

V.   Other Adjustments

   A.   Sale of and Commissions From Crop Hail Insurance Business

Petitioner sold crop hail insurance as a sole proprietor beginning in 1977. He asserts that in 1986, his crop hail insurance business was transferred to Taxman, along with his tax preparation and bookkeeping businesses. He claims that in 1989, Taxman transferred the crop hail insurance business to WFIC because it was confusing for customers to receive crop hail insurance bills from a company called "Taxman". On May 9, 1990, petitioner entered into a purchase contract with Mr. Ihry to sell

_____

[7]Respondent did not raise the potential application of sec. 482 to petitioner's arrangement with WFIC. See, e.g., Haag v. Commissioner, 88 T.C. 604, 614 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). Therefore, we do not address it.

the crop hail insurance business for $25,000.  Respondent argues that the $25,000 is income to petitioner in 1990.  Petitioner has the burden of proving that the sale proceeds were not income to him.  Petitioner maintains that WFIC owned the crop hail insurance business when it was sold.

Petitioner did not present any documentation of the purported transfers of the business to Taxman and to WFIC.  In the 1987 deposition, petitioner admitted that the transfer to Taxman was not documented.  The 1990 purchase agreement was between Mr. Ihry and Jondahl Insurance, not WFIC.  Likewise, the checks paid for the purchase of the business by Mr. Ihry were made out to Jondahl Insurance, although petitioner deposited the checks into WFIC's bank account.  Jondahl Insurance was a party to agency agreements with Farmer's Mutual and Old Republic Insurance Co. in 1986 and 1989, after its alleged transfer.  Neither Taxman nor WFIC is mentioned on either contract.  Farmer's Mutual listed "Jondahl Insurance Agency" on its policy registers for 1990 and 1991.  Petitioner has not shown any evidence to support his claim that his insurance customers received bills from Taxman or that any customers were confused as to the ownership of the business.  In addition, petitioner did not report capital gain from the sale of the insurance business on WFIC's 1990 or 1991 corporate return.

Petitioner did not change any activity with respect to the crop hail insurance business, formally or informally, after he allegedly transferred the business to Taxman and WFIC, except that he deposited the income from the business, including the sale proceeds, into WFIC's bank account. Petitioner's deposits of insurance income into WFIC's bank accounts, in the absence of any other proof that WFIC held the insurance business, do not prove that a transfer occurred. Petitioner alleges that he reported insurance commissions on Taxman's and WFIC's corporate returns, but he has not presented itemized lists of income for the corporations. In addition, petitioner's failure to inform his insurance customers that he was acting on behalf of a corporation is a factor indicating that State law may not have afforded petitioner corporate liability protection. See Hilzendager v. Skwarok, 335 N.W.2d 768, 774 (N.D. 1983).[8]

Petitioner also argues that he should not be required to include the crop hail insurance sale proceeds in his personal income because an IRS audit of his 1987 individual return required him to remove certain deductions from his individual

---

[8]The parties stipulated that North Dakota law did not allow corporations to hold insurance licenses until 1995. Our analysis of North Dakota insurance law, however, revealed no such limitation. In any case, we do not consider this factor to be relevant to our determination. Cf. Jones v. Commissioner, 64 T.C. 1066 (1975) (holding that a court reporter's assignment of income to her personal service corporation was invalid because State law did not allow corporations to perform court reporter services).

return.  He claims the IRS characterized the items as corporate expenses.  The record contains two documents from the audit of petitioner's 1987 return, a statement of income tax examination changes and a partially redacted copy of a letter from the revenue agent.  Although it is clear that certain deductions were removed from petitioner's individual return pursuant to the audit, neither document refers to the crop hail insurance business, Taxman, or WFIC.  We find no relevance in the audit documents regarding the sale of the crop hail insurance business.

We conclude that petitioner has not met his burden of proving that the crop hail insurance business was transferred to Taxman and WFIC.  Consequently, any sale proceeds or commission income earned by Jondahl Insurance while petitioner owned the insurance business was properly taxable to petitioner, not WFIC or Taxman.

Three checks from Mr. Ihry to Jondahl Insurance are in the record evidencing the payment of the purchase price, dated May 9, 1990, November 2, 1990, and November 19, 1990, for $1,000, $3,962, and $10,000, respectively.  The purchase agreement between petitioner and Mr. Ihry provided that petitioner would receive commissions from Farmer's Mutual earned in 1990 and 1991, and the amount Mr. Ihry owed would be reduced by the amount of the commissions.  The parties stipulated that Jondahl Insurance received $10,038 from Farmer's Insurance in 1990, representing a

portion of the commissions earned by Jondahl Insurance between May and November 1990. This amount plus the checks issued by Mr. Ihry (totaling $14,962) equal $25,000. We conclude that capital gain of $14,962 and ordinary income from commissions of $10,038 should be included in petitioner's 1990 income.

Respondent has introduced Farmer's Mutual policy registers for 1990 and 1991 showing that Jondahl Insurance earned insurance commissions of $12,881.70 in 1990 and $3,141.95 in 1991. Respondent contends that these amounts are income to petitioner in addition to the $25,000 sale proceeds. Because respondent asserted an increased deficiency in his amended answer based on the inclusion in income of the insurance commissions, respondent has the burden of proving that petitioner received the commissions. See Rule 142(a).

Respondent does not explain why petitioner would have received commission income after he sold the business at the end of 1990. From the record before us, it appears that the commission amounts listed in the Farmer's Mutual policy registers may include the amount paid as part of the purchase price ($10,038), which we have already determined was income to petitioner. It is also possible that the additional commissions listed for 1990, to the extent they exceed $10,038 ($2,844), and the $3,141.95 listed for 1991 were received by Mr. Ihry after the business was sold or were part of the purchase price, settled by

a charge-back between Mr. Ihry and petitioner.  The record does not show that petitioner in fact received the commissions for 1990 and 1991 beyond the $10,038 paid as part of the purchase price.  On the basis of the record before us, we conclude that respondent has not met his burden of showing that the insurance commissions of $12,881.70 in 1990 and $3,141.95 in 1991 were income to petitioner.

B.  Repossession of Lone Tree Manor

Capital gain of $22,028 was reported on WFIC's 1990 corporate return as gain from the repossession of Lone Tree Manor.  Respondent argues that petitioner, not WFIC, should recognize capital gain of $20,244 from the repossession. Petitioner does not explain how the amount of capital gain ($22,028) was reached for the purpose of WFIC's return, and we afford respondent's determinations a presumption of correctness. See Rule 142(a).  Petitioner contends that he bought Lone Tree Manor in 1987 in his own name for the assumption of a mortgage on the property held by IRET.  He also claims that in 1989 he transferred Lone Tree Manor to WFIC in exchange for WFIC's assumption of the debt and other consideration.  Petitioner did present an alleged purchase agreement evidencing the transfer of Lone Tree Manor to WFIC, but the copy entered into evidence does not show the date on which it was signed or the date the purchase was effective.  It is a one-page document that lists Lori as the

seller and WFIC as the buyer. It is signed on behalf of WFIC by petitioner's sister, Janeen Conrad. Petitioner did not produce any accompanying documents, such as the title to the property, the IRET mortgage, the canceled note to petitioner, or any Forms 1099 showing interest paid on the IRET mortgage. The record does not show that petitioner transferred title to Lone Tree Manor to Lori (for sale to WFIC) or WFIC. We do not believe that petitioner has met his burden of proving that WFIC owned Lone Tree Manor at any time. We conclude that capital gain of $20,244 from the repossession of Lone Tree Manor was income to petitioner for 1990.

### C. Other Income

Respondent argues that petitioner received multiple items of unreported income in each year at issue. Petitioner argues that he is not liable for income tax on the unreported items for various reasons. Petitioner bears the burden of proving that the items listed in the notice of deficiency are not taxable to him. Respondent bears the burden of showing that petitioner received $3,000 from Taxman in each of 1990, 1991, 1992, and 1993.

### 1. Unreported Income in 1990

Respondent adjusted petitioner's 1990 income to include Taxman's $6,000 payment of the settlement judgment against petitioner in connection with his clients' tax shelter investments. Petitioner argues that Taxman assumed the

liabilities of the sole proprietorship, including the settlement judgment, when it took over the business in 1986. However, in the 1987 deposition, petitioner stated that the only liabilities Taxman assumed were two bank loans totaling $31,000. Petitioner did not document the transfer of assets and liabilities to Taxman and has not provided any evidence that Taxman assumed the settlement liability.

Petitioner also argues again that the IRS audit of his 1987 tax return required him to treat the settlement judgment payment as a corporate expense. The audit papers in the record contain no reference to the settlement judgment or the liabilities that were or were not transferred to Taxman. Petitioner has not met his burden of proving that Taxman assumed the $6,000 liability; therefore, the $6,000 payment is compensation income to petitioner for 1990.

Taxman paid $310 to the law firm of Pearson, Christensen & Fischer during 1990. The payment was for consultations between petitioner and Mr. Pearson regarding Schedules C, Profit or Loss From Business (Sole Proprietorship), of petitioner's personal income tax returns for 1982, 1983, and 1984. Petitioner claims that he did not report the $310 as personal income because Taxman assumed the liabilities of his sole proprietorship, and he was instructed in the audit for his 1987 return to place "deductions of business expenses" on Taxman's return. The audit of

petitioner's 1987 return has no relevance to business expenses of the sole proprietorship in 1982, 1983, and 1984, because any business expenses taken as deductions for those years were incurred before Taxman existed.  In addition, we concluded above that the record does not support that Taxman assumed any liabilities other than two bank loans.  Therefore, petitioner had income of $310 in 1990 from Taxman's payment for petitioner's personal legal expenses.

In 1990, Taxman also repaid a bank loan for $2,000, plus interest of $147, that had been obtained in petitioner's name in July 1989.  Petitioner claims that he obtained the loan in his own name because Taxman had reached the limit of its line of credit with the bank.  Petitioner testified that he deposited the funds into WFIC's account, and WFIC used the funds until it received its tax refund in 1990.

The 1989 bank statements for WFIC, Taxman, and petitioner are not part of the record.  Petitioner offered no evidence that Taxman's credit limit had been reached or that the loan funds were deposited into WFIC's bank account.  We give little weight to petitioner's testimony on this matter given that he claimed Taxman had reached the limit of its line of credit but WFIC used the funds and repaid the loan.  We do not believe petitioner has met his burden of proving the $2,147 was not repaid on his behalf

by Taxman. Petitioner therefore must include the $2,147 as compensation income in 1990.

### 2. Unreported Income in 1991

In 1991, Taxman accepted a stereo worth $509 from a client in exchange for a corresponding reduction in the client's bill. Petitioner then gave the stereo to his girlfriend, Ms. Lane. Respondent argues that petitioner's income should be adjusted by $509 to reflect the value of the stereo. Petitioner argues that he gave Ms. Lane the stereo and in exchange she worked in a Taxman Express office for 1 month. We believe the stereo was compensation to Ms. Lane from Taxman. Ms. Lane credibly testified that she worked at the Taxman Express office because she wanted to pay petitioner back for the stereo after she received it. We believe the arrangement between petitioner and Ms. Lane resulted in a benefit to Taxman that is equal to or greater than the value of the stereo. As a result, we do not believe that the value of the stereo is income to petitioner.

Taxman paid petitioner $2,052 in 1991. Petitioner argues that as a result of the 1987 audit, the $2,052 was removed from his personal Schedule C because it was an expense of Taxman. He claims that in order for Taxman to take the expense as a deduction, the revenue agent advised him that Taxman should reimburse petitioner for the amount of the expense in 1991. Therefore, petitioner argues that the $2,052 was not income to

him in 1991 because it was a reimbursement of the earlier expense he paid on behalf of Taxman.

The statement of income tax examination changes from the 1987 audit disallows a $2,052 deduction from petitioner's Schedule C. This statement is signed by the revenue agent with a date of December 28, 1990. The record also includes a portion of a letter from the IRS to petitioner and Lori explaining that the $2,052 was removed because it was "not an expense of the * * * [taxpayer], but an expense of another". The only references to a "reimbursement" on the audit documents are handwritten notes by petitioner. No official correspondence from the revenue agent refers to reimbursement.

Petitioner has shown that an expense of $2,052 was disallowed on his 1987 personal return. However, he has not shown that he actually paid the expense on Taxman's behalf in 1987, that it was a properly deductible expense of Taxman, or that the revenue agent instructed him that reimbursement was an appropriate course of action. We do not believe that petitioner has met his burden of proving that the $2,052 Taxman paid him in 1991 was reimbursement for an expense petitioner paid in 1987. Therefore, the $2,052 is income to petitioner in 1991.

During 1991, petitioner bought furniture using a credit card issued in his name. All of the payments on the credit card during 1991 and 1992 were made by Taxman. In 1991, Taxman paid

$2,086 toward the price of the furniture.  Petitioner argues that the amounts Taxman paid for his furniture were loans to him.

Petitioner claims that the loans were recorded on the "loan schedule as a note receivable" and the balance sheet on Taxman's 1991 corporate return.  Respondent entered into the record a document that appears to be a schedule of loans from Taxman and WFIC to petitioner.  For 1991, the schedule shows no loans from Taxman to petitioner and $29,800 in loans from WFIC to petitioner.  Taxman's 1991 corporate tax return does not reflect any new loans to petitioner in 1991.  WFIC's 1991 corporate return lists receivables of $29,800, and a purported schedule of loans from WFIC to Taxman also states that WFIC lent Taxman $29,800 in 1991.  Taxman's balance sheets, filed with its tax returns for 1991 and 1992, do not list these amounts as liabilities.

Whether a withdrawal of funds from a corporation creates a true debtor-creditor relationship is a factual question to be decided on the basis of all of the relevant facts and circumstances.  Haag v. Commissioner, 88 T.C. at 615.  For disbursements to constitute true loans, there must have been an unconditional obligation on the part of the transferee to repay the money and an unconditional intention on the part of the transferor to secure repayment at the time that the funds were transferred.  Id. at 615-616; see also Haber v. Commissioner, 52

T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970).  Courts have focused on certain objective factors to distinguish bona fide loans from disguised dividends, compensation, and contributions to capital.  The factors considered relevant for purposes of identifying bona fide loans include (1) the existence or nonexistence of a debt instrument; (2) provisions for security, interest payments, and a fixed payment date; (3) treatment of the funds on the corporation's books; (4) whether repayments were made; (5) the extent of the shareholder's participation in management; and (6) the effect of the "loan" on the transferee's salary.  Haber v. Commissioner, supra at 266. When the individual is in substantial control of the corporation, as petitioner is in this case, special scrutiny of the situation is necessary.  Id.; Roschuni v. Commissioner, 29 T.C. 1193, 1202 (1958), affd. 271 F.2d 267 (5th Cir. 1959).

From the record, it is possible that WFIC lent money to Taxman in 1991, which then lent the amounts to petitioner for his furniture purchase.  However, although petitioner has shown that WFIC may have lent amounts to Taxman during 1991, he has not shown any evidence of a loan from Taxman to himself during 1991. He does not claim that a debt instrument was created, and none is in the record.  Petitioner has provided no evidence that he offered anything as security for the loan, interest payments on the principal amount, or fixed payment dates.  As we stated

above, the loan was not recorded on Taxman's books, and there is no evidence that petitioner repaid any of the $2,086. Although petitioner was not a shareholder of Taxman, he controlled the management and day-to-day operations of Taxman. The shareholders did not participate at all in the business. The record does not reflect how, if at all, the loans affected petitioner's salary from Taxman. We conclude that Taxman's payment of petitioner's credit card debt in 1991 for his furniture did not create a loan between petitioner and Taxman. Instead, the $2,086 payment should be treated as compensation to petitioner and included in his 1991 income.

### 3. Unreported Income in 1992

As mentioned above, Taxman paid $1,904 toward petitioner's furniture purchase in 1992. Taxman also paid $15,000 toward petitioner's personal tax liability from an earlier year. Petitioner claims the $15,000 was reflected in two promissory notes he executed between Taxman and himself. No debt instrument was created for the furniture payment. The record contains no evidence that petitioner gave security for the loans or provided for fixed payment dates. However, the loan schedule for Taxman and WFIC that is in the record and Taxman's 1992 corporate return reflect that Taxman lent petitioner a total of $20,856 in 1992. This amount is more than the two loans petitioner argues he received from Taxman in 1992 and may include additional loans for

that year not challenged by respondent. The loan schedule provides for an interest rate of 7 percent and shows that petitioner purportedly repaid some of the debt in a later year. We believe petitioner has proven that he borrowed $1,904 and $15,000 from Taxman in 1992. Therefore, these amounts were not income to petitioner in 1992.

Respondent also determined in the notice of deficiency that petitioner was required to include in income the balance of WRP's money market account ($10,931) that he withdrew in April 1992. The parties stipulated that the $10,000 given to petitioner by Ms. Garceau was not used for real estate investments as Ms. Garceau intended. As we understand petitioner's argument, he asserts that in 1995, he repaid Ms. Garceau the $10,000 plus 8 percent interest, borrowing the funds necessary to do so from WFIC. He claims a promissory note in the record for $13,674.35 (which approximately equals $10,000 plus 8 percent interest, compounding annually over 5 years) evidences the transaction. However, petitioner has not shown that he actually repaid Ms. Garceau or WRP. The record does not contain petitioner's or WFIC's bank statements for 1995, and we cannot verify that $13,674.35 was withdrawn from either of them. Ms. Garceau did not testify, and petitioner's testimony on this matter was unsupported by the record. In addition, the purported debt for $13,674.35 is not reflected on WFIC's 1992 loan schedule or

corporate tax return. Therefore, we agree with respondent that petitioner must report the $13,674.35 as compensation received in 1992.

### 4. Unreported Income in 1993

In 1993, Taxman paid $310 to repair a 1991 Ford Probe owned by Mary. Petitioner argues that the $310 was an expense of Taxman because he used the car on business trips. Specifically, petitioner testified that he "thinks" he used Mary's car "a couple of times for business trips." Petitioner offered no evidence beyond his testimony on the business trips for which he used Mary's car. Given the uncertainty with which he testified and his lack of proper record keeping, petitioner has not met his burden of proving that the $310 for the car repair was not compensation to him in 1993.

In 1993, WFIC, doing business as Epic Real Estate, brokered a real estate transaction for petitioner's sister, Ms. Schoeppach. As part of the transaction, WFIC issued a check for $7,000 to Ms. Schoeppach. Eight days later, Ms. Schoeppach paid Epic Real Estate $7,000 as a downpayment. Respondent determined in the notice of deficiency that the $7,000 payment by WFIC to Ms. Schoeppach was income to petitioner. Petitioner argues that after the transaction was completed, he canceled Ms. Schoeppach's $7,000 debt to WFIC because Epic Real Estate received a $9,000 commission which WFIC reported on its 1993 corporate return.

Petitioner claims he canceled the debt because he thought the $9,000 commission was "inappropriate". Because petitioner was an agent of WFIC, his unilateral decision to effectively reduce WFIC's commission by $7,000 without an adequate explanation shows that the $7,000 was in substance compensation from WFIC to petitioner, who then gave it as a gift to his sister. Consequently, the $7,000 is compensation includable in petitioner's 1993 income.

In October 1993, petitioner paid for the Buick with WFIC's funds. Respondent includes the price of the car in petitioner's income in the notice of deficiency. Petitioner claims that the car was purchased for WFIC's business use and that a mileage log was kept for business purposes. He also claims that Mary reported compensation income on her 1993 and 1994 personal tax returns and received Forms W-2 in 1993 and 1994 for her use of the Buick.

Petitioner did not produce either Mary's 1993 tax returns or Forms W-2 or her 1994 Forms W-2 or tax returns. The purported mileage log of automobile use for 1993 is in the record. First, we do not find the mileage log to be a credible representation of petitioner's and Mary's use of the Buick. The mileage log includes entries for the months of July, November, and December 1993, but the Buick was not purchased until October 15, 1993, according to the purchase contract. In addition, the mileage log

lists the beginning mileage (as of July 1993) as 7,660, but the purchase contract and odometer statement filed with the State and signed by Mary list the mileage at the time of the sale as 7,435. Petitioner does not explain the discrepancies.

Second, WFIC is listed as the purchaser of the Buick on the purchase contract, but Mary is listed as the purchaser on the odometer disclosure statement, the damage disclosure statement, and the application for certificate of title and registration of a motor vehicle, all filed with the North Dakota Department of Transportation Motor Vehicles Division. Mary either signed or filled out each official document filed with the Motor Vehicles Division. A draft registration application is included in the record listing WFIC as the car's owner, but it is noted "12/3 changed to Mary Jondahl".

Third, the Buick was issued personalized license plates reading "PURRFCT". Fourth, a 1991 Ford Probe, titled in Mary's name, was traded in and $10,100 was credited to the purchase of the Buick. Lastly, petitioner and Mary filled out and signed two loan applications that list the Buick as an asset personally owned by them. The title to the Buick is not part of the record. All of these facts in the record indicate that petitioner and his wife, not WFIC, were the true owners of the Buick. The record

shows that WFIC paid $18,660 toward the cost of the Buick.[9]
Petitioner must include this amount as compensation in 1993.

### 5. Cash Receipts of $3,000 From Taxman

Respondent argues that petitioner must report $3,000 of compensation for each of 1990, 1991, 1992, and 1993, representing Taxman's cash receipts petitioner used for his own personal expenses. Because the issue was raised in an amended answer, respondent has the burden of proving the $3,000 was income to petitioner in each year.

We found above that respondent has proven by clear and convincing evidence that petitioner fraudulently used at least a portion of the $3,000 for his own personal expenses. Petitioner argued at trial that he used some of the cash to pay for business expenses of Taxman. Respondent has shown that petitioner did not keep any records of these business expenses and that the income and offsetting expenses were not reported on Taxman's corporate returns. Ms. Jilek credibly testified that she could not recall an instance, other than occasional purchases of postage, in which she or petitioner paid an expense of Taxman in cash. Even small expenses were paid by check. In addition, Ms. Jilek testified that she did not know how petitioner spent the cash. This is

---

[9]The purchase price of the Buick was $27,800, plus tax of $885 and "license and fees" of $75, totaling $28,760. This amount was reduced by the value of the Ford Probe trade-in, $10,100, for a net amount payable by WFIC of $18,660.

particularly persuasive in light of the fact that petitioner trusted Ms. Jilek with all other financial aspects of Taxman, including making her a signatory on its bank accounts and his personal credit cards. Petitioner's testimony on this matter is self-serving. He does not address the $3,000 adjustments in his posttrial briefs. Respondent has met his burden of proving that petitioner used the $3,000 each year for personal expenses. Therefore, we find that petitioner must include $3,000 of compensation income for each of 1990, 1991, 1992, and 1993.

D. Head of Household for 1990

Petitioner filed his 1990 individual income tax return claiming head of household filing status. Respondent denied this filing status in the notice of deficiency. A taxpayer may file as the head of a household only if he is not married or is legally separated under a decree of divorce or separate maintenance at the close of the taxable year, he maintains a household which constitutes the principal place of abode of his child for more than half the taxable year, and he furnishes over half the cost of maintaining the household during the taxable year. Sec. 2(b). Petitioner lived with Lori and their daughter until June 1990. Petitioner and Lori were granted a divorce on July 9, 1991. Petitioner did not show that he and Lori were legally separated at the end of 1990. In addition, petitioner did not present evidence that he provided more than half of the

cost of maintaining a household for his daughter in 1990. We conclude that petitioner did not meet his burden of proving that he is entitled to claim head of household status for 1990.

E.    Self-Employment Tax on Commission Income

Respondent argues that petitioner is liable for self-employment taxes on the commissions he earned from his real estate and crop hail insurance activities. Section 1401 imposes tax on self-employment income. Section 1402 defines net earnings from self-employment as the gross income derived by an individual from the carrying on of any trade or business by such individual less allowable deductions attributable to such trade or business. Respondent argues that petitioner is a "qualified real estate agent" within the meaning of section 3508, and that he is liable for self-employment taxes on real estate and insurance commissions he earned. Respondent has the burden of proof with respect to petitioner's liability for self-employment tax.

We found above that WFIC, not petitioner, earned the real estate commissions in 1990, 1991, and 1993. Therefore, petitioner is not liable for self-employment taxes on real estate commissions in 1990, 1991, and 1993. Because petitioner earned a real estate commission as a sole proprietor in 1992, he is liable for self-employment tax on the commission regardless of whether he is a "qualified real estate agent" under section 3508. We also found that petitioner earned crop hail insurance commissions

of $10,038 in 1990.  He is therefore liable for self-employment tax on $10,038 in 1990.

F.  Section 6663(a) Fraud Penalty

If respondent shows that any portion of an underpayment is due to fraud, the entire underpayment will be treated as attributable to fraud for purposes of the penalty under section 6663(a), except any portion of the underpayment that petitioner establishes by a preponderance of the evidence is not attributable to fraud.  See sec. 6663(b); Knauss v. Commissioner, T.C. Memo. 2005-6.  We held above that respondent proved by clear and convincing evidence that petitioner used at least some of Taxman's cash for his own personal expenses with the intent to evade taxation on the income.  We also held that respondent has proven that petitioner used all of Taxman's $3,000 in cash receipts for personal expenses.  Petitioner's lack of record keeping, blatant efforts to hide the existence of the cash, and use of the cash for personal expenses show that he intentionally concealed all of Taxman's cash receipts and took possession of the money with the intent to evade taxes.   Therefore, the section 6663(a) fraud penalty for each year applies to the portion of the deficiency in petitioner's tax attributable to the $3,000 understatement of income.

Respondent argues that the fraud penalty applies to the entire amounts of the deficiencies.  An analysis of whether

petitioner has shown by a preponderance of the evidence that certain items were not fraudulent is necessary. We found above that many of the adjustments respondent made were appropriate because petitioner failed to present enough evidence to the contrary to meet his burden of proof. However, we believe that petitioner has shown by a preponderance of the evidence that the remaining adjustments were not the result of fraud. Petitioner was negligent in his failure to provide documentation of certain loans from Taxman and WFIC and his failure to properly document the transfer of his sole proprietorship to Taxman, but he did not intend to evade tax on these items. While petitioner's attempts to conceal his use of at least $3,000 of Taxman's cash receipts each year indicates fraudulent intent, the other adjustments do not rise to the level of fraud. Petitioner, albeit incorrectly, reported gain from the sale of Lone Tree Manor on WFIC's corporate return. He also had plausible explanations for each item of other income identified by respondent, although he did not produce supporting documentation. Petitioner did show that WFIC and Taxman kept corporate records, and the record includes various loan schedules and corporate tax returns. A review of the record shows that petitioner's actions with respect to the other items respondent adjusted were the result of negligence, but the records petitioner did maintain and the separate corporate accounts refute a fraudulent intent for the other

adjustments.  A high level of negligence does not alone prove fraud.  Fraud may not be imputed or presumed from "'circumstances which at most create only suspicion.'"  Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968) (quoting Carter v. Campbell, 264 F.2d 930, 935-936 (5th Cir. 1959)), affg. T.C. Memo. 1966-81.

> "Fraud implies bad faith, intentional wrongdoing and a sinister motive. * * * Negligence, whether slight or great, is not equivalent to the fraud with intent to evade tax named in the statute.  The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing.  Mere negligence does not establish either. * * *" [Id.]

If we leave aside petitioner's concealing $3,000 in cash each year, his explanations for the other adjustments, while not establishing that the items should not be included as income, refute an assertion that he had fraudulent intent in omitting the items from his returns.  As a result, the section 6663(a) fraud penalty is not sustained with respect to the remaining adjustments.

To reflect the foregoing and concessions by the parties,

Decision will be entered

under Rule 155.